# Illinois Official Reports

## Appellate Court

---

### *In re F.P.*, 2014 IL App (4th) 140360

---

| | |
|---|---|
| Appellate Court Caption | In re: F.P., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. LATAISHA PRICE, Respondent-Appellant.– In re: D.P., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. LATAISHA PRICE, Respondent-Appellant.– In re: F.Y., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. LATAISHA PRICE, Respondent-Appellant. |
| District & No. | Fourth District Docket Nos. 4-14-0360, 4-14-0361, 4-14-0362 cons. |
| Filed | September 30, 2014 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's findings that respondent was an "unfit person" and that the termination of her parental rights would be in the best interests of her three children were affirmed, since respondent failed to make reasonable progress toward the return of her children during the initial nine months after the adjudication that they were neglected, especially when respondent was incarcerated, and even upon her expected release in 2015, she still would have to take parenting classes and obtain suitable housing, and the lack of an adoptive placement for two of the children did not preclude a finding that the termination of respondent's rights would be in their best interests. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, Nos. 12-JA-16, 12-JA-17, 12-JA-18; the Hon. Esteban F. Sanchez, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

William A. Pryor (argued), of Pryor Law Offices, of Springfield, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and James C. Majors (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Harris and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1    In these three consolidated cases, respondent, Lataisha Price, appeals from judgments terminating her parental rights to three children: F.P., D.P., and F.Y.

¶ 2    The trial court's finding that she is an "unfit person" is not against the manifest weight of the evidence. The court's other finding, that it would be in the children's best interest to terminate her parental rights, is neither an abuse of discretion nor against the manifest weight of the evidence. Therefore, we affirm the trial court's judgments in the three cases.

¶ 3                              I. BACKGROUND

¶ 4                              A. Shelter Care

¶ 5    F.P. is a boy born on September 27, 2007. D.P. is a girl born on July 18, 2006. F.Y. is a boy born on March 12, 2003.

¶ 6    On February 24, 2012, in three separate cases, the State filed petitions to adjudicate F.P., D.P., and F.Y. to be neglected minors and to make them wards of the court.

¶ 7    That same day, the trial court held a shelter-care hearing, in which, on the basis of a stipulation by respondent, the court found probable cause to believe that the children were neglected. The court awarded temporary custody and guardianship to the Illinois Department of Children and Family Services (DCFS).

¶ 8              B. Adjudicating the Children To Be Neglected Minors
                    and Making Them Wards of the Court

¶ 9    On September 13, 2012, respondent signed a stipulation to one of the allegations of neglect, namely, that the children had been in an environment injurious to their welfare in that she had been using drugs. See 705 ILCS 405/2-3(1)(b) (West 2012). That same day, on the basis of the stipulation, the trial court found the children to be neglected.

¶ 10    On October 25, 2012, the trial court made the children wards of the court and awarded custody and guardianship to DCFS.

¶ 11                                    C. Motions To Terminate Parental Rights

¶ 12         On November 5, 2013, in all three cases, the State filed motions for the termination of parental rights. In each case, the State alleged that respondent met the following statutory definitions of an "unfit person": (1) she had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (see 750 ILCS 50/1(D)(b) (West 2012)); (2) she had failed to make reasonable efforts to correct the conditions that had been the basis for removing the minor from her (see 750 ILCS 50/1(D)(m)(i) (West 2012)); (3) within nine months after the adjudication of neglect, she failed to make reasonable progress toward the return of the minor (see 750 ILCS 50/1(D)(m)(ii) (West 2012)); and (4) within any nine-month period after the end of the initial nine-month period following the adjudication of neglect, she failed to make reasonable progress toward the return of the minor (see 750 ILCS 50/1(D)(m)(iii) (West 2012)).

¶ 13                                         D. The Hearing on the Issue of
                                     Whether Respondent Was an "Unfit Person"

¶ 14                               1. *The Exclusion of Sammy Wright as a Party*
                              *Whose Parental Rights the State Sought To Terminate*

¶ 15         The trial court consolidated the three cases for hearing, and on February 20, 2014, it held a hearing on the issue of whether respondent was an "unfit person" as alleged in the motions to terminate parental rights.

¶ 16         At the beginning of the hearing, the assistant State's Attorney, Ali Orr, told the trial court that, although the State was seeking to terminate the parental rights of respondent and unknown fathers, the State was not seeking, as of yet, to terminate the parental rights of Sammy Wright, the father of F.P. (The fathers of D.P. and F.Y. were unknown.)

¶ 17                                              2. *Judicial Notice*

¶ 18         Also at the beginning of the hearing, Orr requested the trial court to take judicial notice of three orders it previously entered in each case. The first order was the adjudicatory order of September 13, 2012, which found the child's environment to be injurious due to respondent's use of drugs. The second order was the dispositional order of October 25, 2012, which made the child a ward of the court. The third order was the dispositional order of October 31, 2013, which denied further visitation to respondent. The court asked the other attorneys if they objected to the proposed judicial notice. They had no objection, and therefore the court took judicial notice of the three previous orders.

¶ 19         The trial court then heard evidence on the question of whether respondent and the unknown fathers were "unfit persons." Two witnesses testified in this hearing: Elizabeth Unsworth testified for the State, and respondent testified on her own behalf.

¶ 20                                  3. *The Testimony of Elizabeth Unsworth*

¶ 21                             a. The Two Periods When She Was the Caseworker

¶ 22         Elizabeth Unsworth testified she was employed at Rutledge Youth Foundation as a foster-care caseworker and that, from January to March 2013 and August 2013 to the present, she was the caseworker assigned to the three children. (The initial nine-month period after the

adjudication of neglect was September 13, 2012, to June 13, 2013. Unsworth was the caseworker for three months, January to March 2013, of that nine-month period.)

¶ 23                                    b. The Reason Why the Children Came Into Care

¶ 24    Unsworth had learned from "the integrated assessment" why the children came into care. Before she could testify to what "the integrated assessment" said, respondent's attorney, Sara Mayo, made a hearsay objection. The trial court asked Orr:

"THE COURT: And for what purpose are you introducing that?

MS. ORR: To go towards what the parents needed to make progress for, in order to have the children returned to their care.

THE COURT: So, not for the truth of the matter asserted, but to establish what she did or did not do with regard to the case?

MS. ORR: Yes, Your Honor.

THE COURT: The objection is overruled. You may proceed.

A. It's my understanding, based on the integrated assessment, that [respondent] came to the attention of DCFS when she was arrested for attempting to sell [D.P.] and two other children to men or woman [*sic*]–I don't know the people that she was attempting to contact about this–for money in exchange for the children providing sex services."

¶ 25                                    c. The Service Plans

¶ 26    Four service plans were established for the family members. The first one covered the period of April to July 2012. The second one covered the period of August 2012 to February 2013. The third one covered the period of February to August 2013. The fourth one covered the period of August 2013 to February 2014.

¶ 27    Unsworth assumed that respondent had received a copy of the first two service plans, but because Unsworth was not the caseworker when the first two service plans were initiated, she could not testify, from firsthand knowledge, that respondent had received a copy of them. She could testify from firsthand knowledge, however, that respondent received the third and fourth service plans, because she remembered meeting with respondent at Dwight Correctional Center and discussing with her the third service plan, and also because she had respondent's signatures acknowledging receipt of the third and fourth service plans in the mail.

¶ 28    All four service plans gave respondent the following tasks. She was to obtain a substance-abuse assessment and mental-health assessment, and she was to follow through with any recommendations. She was to attend parenting classes. She was to obtain adequate housing and employment. She was to participate in the community by establishing relationships with family-service providers and community groups.

¶ 29    Of those tasks, the only one that respondent ever completed was undergoing substance-abuse treatment. Being in prison hindered her from doing most of the other tasks.

¶ 30                                    d. The Discontinuation of Visitation

¶ 31    Respondent was having supervised visits with the children, but "visitation ended in April of 2012 due to incarceration." At that time, respondent was in the Sangamon County jail,

which did not allow visitation. Afterward, she was imprisoned in Dwight Correctional Center, and visitation started up again, but visitation proved impractical because of the difficulty of keeping the children from dispersing. "[A] correctional officer had to inform [respondent] that she had to have the kids with her." Finally, in December 2012, "on the recommendation of the therapist," "a critical decision was made to suspend visits due to the fact that the children had a difficult time following visitation and before visitation as well."

¶ 32 Respondent continued sending the children cards and letters, however.

¶ 33                              4. *The Testimony of Respondent*

¶ 34 Respondent testified she had been incarcerated for two years and that she presently was in Logan Correctional Center. Her expected date of release was March 19, 2015.

¶ 35 On August 2, 2013, she completed substance-abuse treatment with an organization called "Wells."

¶ 36 She would complete mental-health counseling in 15 days, on March 7, 2014.

¶ 37 She began parenting classes before her imprisonment but had not completed them. She could not take parenting classes in Dwight Correctional Center, because the outside organization that taught the parenting classes refused to enroll anyone who had to register as a sex offender.

¶ 38 She wanted to receive visits from her children, but "they" kept telling her she could not do so.

¶ 39 When asked why her children had been removed from her custody, she answered: "It was said that I tried to sell my daughter." (We will take judicial notice that, according to the official website of the Sangamon County circuit clerk, respondent pleaded guilty to one count of indecent solicitation of a child (720 ILCS 5/11-6(a) (West 2012)) on July 13, 2012, in Sangamon County case No. 12-CF-212 and was convicted of that offense on her guilty plea. See http://records.sangamoncountycircuitclerk.org/sccc/DisplayDocket.sc; *Nordine v. Illinois Power Co.*, 32 Ill. 2d 421, 428 (1965) (courts may take judicial notice of public records, such as decisions of the Illinois Public Utilities Commission); *People v. Young*, 355 Ill. App. 3d 317, 321 n.1 (2005) (the appellate court may take judicial notice of information on the official website of the Illinois Department of Corrections).)

¶ 40 Attorney Mayo asked respondent:

"Q. [(By Ms. Mayo):] Why do you think the Court should not find you unfit?

A. Cause I'm changing to be a better person now. I'm going to be a better person when I get out. I'm doing [Alcoholics Anonymous (AA)] meetings now, too, also.

Q. So, you're also doing AA?

A. Yes.

Q. And how often do you do those?

A. Every Tuesday.

Q. And how do you think that you will be a better parent?

A. I do things with my kids that I should do. I take them places, and I'm not going to drink and do drugs anymore. So, I'm going to be a better parent and better person."

¶ 41                                   5. *The Trial Court's Finding*

¶ 42        After hearing the testimony and the arguments of counsel, the trial court found the State had proved respondent to be an "unfit person"–but only in the sense that she failed to make reasonable progress during the first nine months after the adjudication of neglect. The court stated:

> "While I find that [respondent] has maintained a reasonable degree of interest, concern, or responsibility as to the minor's welfare, and she did make some efforts, both before and after her incarceration, based upon Ms. Unsworth's testimony and the evidence adduced during that testimony, I find that [respondent] failed to make reasonable progress toward the return of the minor children [to] her within nine months. Specifically, the period of 9-13-12 to 6-13-13.
>
> As the children are not, today, prepared to be returned to her, she has not completed all of her services. For example, just to name [three], parenting classes, housing, employment.
>
> Now, the argument made by Ms. Mayo is that she's incarcerated, and true. So, she cannot secure housing or employment. However, in order for us to wait until 2015 and beyond, I do not believe it's appropriate because these children have been waiting for some time. It is my belief that, for those reasons, and because she's failed to make reasonable progress as alleged in Paragraph C, 8C, of the petition, the Court is going to find that [respondent] is an unfit parent.
>
> With regard to unknown fathers, the Court also finds that unknown fathers are unfit parents as to each of the children on the finding of unfitness and [respondent] as to each of the children as well."

¶ 43        In the motions to terminate parental rights, paragraph 8(c) alleged that respondent was an "unfit person" in the sense that she had "failed to make reasonable progress towards the return of the minor to [her] within 9 months after an adjudication of [n]eglect." See 750 ILCS 50/1(D)(m)(ii) (West 2012).

¶ 44                                   E. The Best-Interest Hearing

¶ 45        On April 16, 2014, the trial court held a best-interest hearing. The State called one witness, Unsworth, and respondent called two witnesses, Betty Price and Lachendra Price.

¶ 46                                   1. *The Testimony of Elizabeth Unsworth*

¶ 47        Unsworth testified that, since February 2012, F.P., age 6, and D.P., age 7, had lived together in the same specialized foster home, with a nonrelative as the foster parent. The placement was specialized "due to behaviors they were displaying in the home."

¶ 48        Both F.P. and D.P. were "making progress." F.P., who had attention deficit/hyperactivity disorder, was doing better in school. D.P. likewise had become "less aggressive" at school and more temperate at home, with fewer "outbursts"; she had gotten "better about accepting things as they [were] and not how she want[ed] them to be." The two of them went to ABC Counseling once a week "for sexual behaviors that they displayed upon the case opening," and they also saw another counselor, in Rochester, "to help with coping skills and also with behavior and addressing anger and different emotions."

¶ 49    Although the foster mother, Odessa Rolfe, was unwilling to adopt F.P. and D.P., considering that she already had adopted a seven-year-old, "her preference[ ] [was] to be there for them until something [was] found." She was giving F.P. and D.P. "a structured home with close supervision," which is what they needed "[d]ue [t]o their behaviors." Unsworth was "looking for adoptive placement" for D.P. but "not so much" for F.P., considering that his father, Sammy Wright, still had his parental rights.

¶ 50    The third child, F.Y., age 10, was placed in a separate foster home, with a nonrelative, a woman named Cox (the record does not appear to reveal her first name). He had been there since December 2012. This placement likewise was "specialized due to behaviors that he was showing in the home[:] [t]he sexual behaviors as well as the outbursts and acting out."

¶ 51    Because of her poor health, Cox did not intend to adopt F.Y. Nevertheless, it was her "preference" to "provide him permanency until an adoptive placement [could] be found."

¶ 52    F.Y. was "stable in his foster home," and he was receiving the same counseling as his two siblings. He was "making progress" in the counseling sessions and in school, where he had an individualized educational plan to address a "slight speech impediment."

¶ 53    Orr asked Unsworth:

"Q. Is it important that these minors not be moved from their current foster homes until a permanent placement is found?

A. Yes.

Q. Why so?

A. They need stability, and to move them without having an adoptive placement would be problematic for their progress with counseling and things."

¶ 54    The last time the three children saw respondent was in November 2012. Unsworth did not perceive any attachment between the children and respondent, and she did not think any harm would result to the children if the parental rights of respondent and the unknown fathers were immediately terminated.

¶ 55    On cross-examination by Mayo, however, Unsworth admitted that, "[m]aybe like once a month," the children mentioned their mother. She also admitted that although they never "mentione[d] wanting to go home with their [mother]," they had remarked that they missed her.

¶ 56    On cross-examination by the guardian *ad litem*, Gregory Sronce, Unsworth testified that Sammy Wright was a potential placement for his son, F.P., and that the two of them visited regularly. Unsworth also answered yes when Sronce asked her whether "the children [had] expressed any interest or [had] verbalize[d] any interest in being adopted in the future."

¶ 57                                    2. *The Testimony of Betty Price*

¶ 58    Betty Price testified that she was respondent's aunt and that before the children came into care, she saw respondent with them "[a]t least once a month." "She was always good with the kids," Betty Price said, and the children were affectionate toward respondent, and she was affectionate toward them.

¶ 59    In the past two years, ever since the children came into care, Betty Price saw them only two times: in August 2013, in a McDonald's restaurant, and at another, unspecified time at "the foster mother['s] [house]." In the restaurant, the children were visiting with an older sister,

who was not in care. The children recognized Betty Price and came up to her, and the interaction was "great." Mayo asked her:

"Q. And when they recognized you, did they make any comments to you?

A. Yeah. They always do. The first thing they say is, 'Have you seen my mom? Have you talked to my mom?'

Q. And when you talk to them, do you ever ask about when they're going home with mom or when mom will be back in their life?

A. All the time."

¶ 60 In Betty Price's opinion, terminating respondent's parental rights would "totally destroy those kids" and would "destroy [respondent] also."

¶ 61 3. *The Testimony of Lachendra Price*

¶ 62 Lachendra Price testified that she was respondent's first cousin and that before the children came into care, she saw respondent with the children "[m]aybe four days out of a week." Mayo asked her:

"Q. And when you observed [respondent] and her children, what was their interaction like?

A. Basically, like some days we would go to the park together. The kids love they mom. No discipline. No discipline. We sit down and talk. The kids, I have children myself. They run around and play. [Respondent] come in. They come in. She feeds the kids. Eventually, I go home."

¶ 63 The children were affectionate toward respondent, and she was affectionate toward them. The children showed no fear of her. Their relationship with their mother "seemed appropriate."

¶ 64 Mayo asked Lachendra Price:

"Q. How was [respondent] at mothering the children?

A. She was great with mothering the children. The youngest was stuck to her like glue. I use to tell her, 'Put that boy down,' and she wouldn't put him down, but she was great at mothering her children. She showed affection, love, hugs, kisses."

¶ 65 After "this case came into care about two years ago," Lachendra Price saw "the youngest three with the lady that they're staying with." This was in the summer of 2013, and the lady let her "talk to them."

¶ 66 Mayo then asked Lachendra Price:

"Q. I'm going to talk to you about the two separate cases, okay. Let's talk about the younger kids, the younger two?

A. Uh-huh.

Q. Where did you see them at?

A. I seen them at the public aid office.

Q. They were with their foster mom?

A. Yes."

According to Lachendra Price, the two younger children ran up to her on this occasion, gave her a hug, and "the oldest boy," F.Y., asked her whether she had seen his mother. Lachendra

Price told him yes. He then asked her, " 'When is my mom coming to get us?' " She replied to him that she did not know.

¶ 67 Mayo asked Lachendra Price:

"Q. *** Did the younger two ask any questions about their mom?

A. The little girl. She asked me, like, she say, 'Can we go over your house? Is my mom going be at your house? Can we go over to your house?' I told her she wasn't going to be at my house that day.

Q. How did the little girl react to that?

A. She asked me for my telephone number.

Q. Did she seem sad, she wouldn't get to see her mom?

A. Yes.

Q. Now, you said you saw [F.Y.] about a week ago?

A. Yes.

Q. And where did you see him?

A. He was outside the store.

Q. And who was he with?

A. He was with an older woman. She never introduced us.

Q. Did he recognize you?

A. Yeah. I didn't even see him. He seen me first. He ran up and gave me a hug.

Q. Great. When he ran up and gave you a hug, did he talk about his mom?

A. Yeah. He asked me, do I know when his mom comes home.

Q. Did he make any mention of missing her or wanting to see her?

A. He said that he's ready to go back with his mom and he wanted to be around family."

¶ 68 In Lachendra Price's opinion, "it would hurt the kids just as well as [respondent]" if her parental rights were terminated.

¶ 69 After hearing the testimony and the arguments by counsel, the trial court found it would be in the best interest of the three children to terminate the parental rights of respondent and the unknown fathers. The court reasoned: "In this case, the children are stable in their home, foster home. Based upon the conduct of Ms. Price, they are happy. They're adapting well, and [they are] cared [for] and loved in those homes. I hope that we can find a place for them that provides permanency."

¶ 70                                    II. ANALYSIS
¶ 71                    A. The Finding That Respondent Was an "Unfit Person"
¶ 72                    1. *The Problem That Unsworth's Tenure as Caseworker*
*Was for Only Three Months in the Nine-Month Period*

¶ 73 To reiterate, the trial court found that respondent failed to make reasonable progress during the initial nine-month period following the adjudication of neglect, *i.e.*, September 13, 2012, to June 13, 2013. See 750 ILCS 50/1(D)(m)(ii) (West 2012). Respondent observes, however, that Unsworth was the only witness the State called in the fitness hearing and that, according to her testimony, she was the caseworker for only three months, January to March 2013, in

approximately the middle of the nine-month period. Respondent argues that because the State's only witness, Unsworth, had personal knowledge of only three months in the middle of the nine-month period, her testimony could not possibly qualify as "clear and convincing evidence" that respondent failed to make reasonable progress throughout the nine-month period. *In re M.S.*, 302 Ill. App. 3d 998, 1002 (1999).

¶ 74    Unsworth, however, had personal knowledge of the goals in the service plans. To acquire that knowledge, all she had to do was read the service plans.

¶ 75    In each service plan, the goals were the same: obtain a substance-abuse assessment and mental-health assessment and follow any resulting recommendations, complete a parenting course, obtain adequate housing and employment, and participate in the community by establishing relationships with family-service providers and community groups.

¶ 76    We do not have to take Unsworth's word for it that respondent failed to make reasonable progress on most of those goals. We can take respondent's word for it. Although respondent testified she had completed substance-abuse treatment and that she still was attending AA meetings, and although she testified she would complete mental-health counseling in 15 days, she admitted she had not completed a parenting course. And, obviously, she had not obtained adequate housing and employment, considering that, according to her own testimony, she had been imprisoned for the past two years and would not be released until 2015.

¶ 77                            2. *The Reason for the Removal*

¶ 78    Respondent argues: "Another example of [Unsworth's] lack of personal knowledge is when the witness indicated that the reason for the removal of the children was because the Appellant/Mother was attempting to sell one of the children." But, again, we do not have to take Unsworth's word for it. Sronce asked respondent in the fitness hearing: "What is your understanding of why this case came into existence?" Respondent answered: "It was said that I tried to sell my daughter." We also have taken judicial notice of the information on DOC's website.

¶ 79                         3. *Imprisonment and Reasonable Progress*

¶ 80    According to respondent, when the trial court found her to be an "unfit person" because of a failure to make reasonable progress during the initial nine months after the adjudication of neglect (see 750 ILCS 50/1(D)(m)(ii) (West 2012)), the court made a finding that was against the manifest weight of the evidence, considering that respondent's imprisonment hindered her from completing some of the goals in her service plan. Respondent argues that, under *In re Gwynne P.*, 346 Ill. App. 3d 584 (2004), we should "consider [her] incarceration."

¶ 81    In *Gwynne P.*, the trial court found the mother to be an "unfit person" on five statutory grounds: failure to maintain a reasonable degree of concern, interest, or responsibility (750 ILCS 50/1(D)(b) (West 2002)); failure to make reasonable progress (750 ILCS 50/1(D)(m)(iii) (West 2002)); failure to make reasonable efforts (750 ILCS 50/1(D)(m)(i) (West 2002)); repeated incarceration (750 ILCS 50/1(D)(s) (West 2002)); and depravity (750 ILCS 50/1(D)(i) (West 2002)). *Gwynne P.*, 346 Ill. App. 3d at 590. The trial court also found it would be in the child's best interest to terminate the mother's parental rights, and accordingly, the trial court did so. *Id.* at 588.

¶ 82     In affirming the trial court's judgment (*id.* at 589), the appellate court upheld the statutory ground of repeated incarceration (*id.* at 598), but the appellate court concluded that the remaining four statutory grounds were against the manifest weight of the evidence (*id.* at 593, 596-97, 599).

¶ 83     Because it actually was unnecessary to discuss the remaining four statutory grounds, given that there was sufficient evidence of one statutory ground, repeated incarceration, and only one statutory ground was enough to support a finding that someone was an "unfit person" (see *M.S.*, 302 Ill. App. 3d at 1002), the appellate court's comments on the remaining four statutory grounds are *dicta*. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 277 (2009) (a *dictum* is an expression of opinion that is unnecessary to the outcome). Nevertheless, they are judicial *dicta* as opposed to *obiter dicta*. Instead of being "unrelated to the essence of the controversy" (*Wolf v. Meister-Neiberg, Inc.*, 194 Ill. App. 3d 727, 730 (1990)), they are "expression[s] of opinion upon *** point[s] *** argued by counsel and deliberately passed upon by the court" (emphasis and internal quotation marks omitted) (*Exelon*, 234 Ill. 2d at 277). Judicial *dicta* have precedential effect. *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993). Therefore, we should not ignore the discussion of reasonable progress in *Gwynne P.* just because the discussion is a *dictum*, for it is a judicial *dictum*.

¶ 84     The factual context of the *dictum* is as follows. Three days before the child was born, the mother was arrested for possession of a controlled substance. The child was born and tested positive for cocaine and heroin. About two months later, the mother went to prison and was placed in disciplinary segregation. *Gwynne P.*, 346 Ill. App. 3d at 589.

¶ 85     During the entire nine-month period after the adjudication of neglect, the mother remained in prison, and for eight of those nine months, she was in disciplinary segregation. The service plan required her to do four things: (1) undergo a drug and alcohol assessment, (2) undergo a psychological evaluation, (3) take parenting classes, and (4) receive any recommended counseling. In segregation, however, the only available services were psychological evaluation and counseling. The mother underwent a psychiatric evaluation while in segregation, and the psychiatrist did not recommend any psychiatric treatment. Although the mother was unable to participate in any other services while she was in segregation, she put her name on the waiting lists for parenting classes and a drug assessment. As soon as she was released from segregation, she began parenting classes, and she finished the parenting course a week after the nine-month period ended. She remained on the waiting list for a drug assessment, and she began substance abuse classes after she was transferred to another prison a few months later. *Id.* at 595.

¶ 86     The appellate court held:

        "Because [the mother] took several steps toward completing the services in her service plan, including her persistent efforts to schedule visits with Gwynne P., we find [the mother] made *a minimum measurable or demonstrable movement toward reunification*. The court's finding that she failed to make reasonable progress was against the manifest weight of the evidence." (Emphasis added.) *Id.* at 595-96.

¶ 87     Respondent says: "The *Gwynne* court took into consideration the situation in which the mother was in [*sic*]. She was in the Department of Corrections." The *Gwynne* court did not explicitly say, however, that because the mother was in prison during the nine-month period, less progress should have been required of her than otherwise should have been required. Instead, the *Gwynne* court found that the mother had made "a minimum measurable or

- 11 -

demonstrable movement toward reunification"–as if reasonable progress were minimal progress. *Id.* at 596. The *Gwynne* court obtained this standard of "a minimum measurable or demonstrable movement toward [reunification]" from *In re Sheltanya S.*, 309 Ill. App. 3d 941, 953-54 (1999) (*Gwynne P.*, 346 Ill. App. 3d at 594), and, ultimately, the standard is a garbling of what the appellate court said in *In re Austin*, 61 Ill. App. 3d 344, 350 (1978): "Accordingly, the term 'reasonable progress' requires[,] at a minimum[,] measurable or demonstrable movement toward the goal of return of the child." There is a big difference between saying that reasonable progress requires, at a minimum, measurable or demonstrable movement and saying that it requires a minimum measurable or demonstrable movement.

¶ 88   We have held that "reasonable progress" is an "objective standard" and that a parent has made reasonable progress when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991); see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006); *In re Jordan V.*, 347 Ill. App. 3d 1057, 1068 (2004); *In re B.W.*, 309 Ill. App. 3d 493, 499 (1999); *In re K.P.*, 305 Ill. App. 3d 175, 180 (1999). If all a parent had to do was make "a minimum measurable or demonstrable movement toward reunification," it could be years before the parent was prepared for reunification. *Gwynne P.*, 346 Ill. App. 3d at 596. Attending only one half-hour class would be a minimal movement toward reunification, but this movement, or progress, might be less than reasonable. Therefore, we adhere to *L.L.S.*, and we decline to follow *Gwynne P.*, because it applies an incorrect definition of "reasonable progress."

¶ 89   When we review the evidence in the fitness hearing, it is unclear to us that, "in the near future," the trial court would have been able to return the children to respondent's custody. *L.L.S.*, 218 Ill. App. 3d at 461; see also *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 256 (1992) ("For a judgment to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident."). After her release from prison in 2015, respondent still would have to take parenting classes and obtain suitable housing. Time in prison is included in the nine-month period during which reasonable progress must be made. *In re J.L.*, 236 Ill. 2d 329, 343 (2010). Arguably, respondent failed to make reasonable progress during the nine months following the adjudication of neglect because, as of the date of the fitness hearing, the children could not be returned to her in the near future. That her personal circumstances prevented her from making reasonable progress is irrelevant to the "objective standard." *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 90                    B. The Finding That It Was in the Children's Best Interest
                         To Terminate Respondent's Parental Rights

¶ 91   For essentially two reasons, respondent argues the trial court made a decision that was against the manifest weight of the evidence when it found that terminating her parental rights would be in the children's best interest.

¶ 92   First, respondent points out that DCFS "had not found adoptive placements for the children." Actually, only two of the children were available for adoption: D.P. and F.Y. Sammy Wright had not yet been found to be an "unfit person" as to his son, F.P. Although the lack of an adoptive placement for D.P. and F.Y. was a factor to consider, it did not necessarily preclude a finding that terminating respondent's parental rights would be in D.P.'s and F.Y.'s

best interest. See *In re J.R.*, 342 Ill. App. 3d 310, 322 (2003); *In re D.M.*, 336 Ill. App. 3d 766, 775 (2002); *In re Tashika F.*, 333 Ill. App. 3d 165, 170-71 (2002); *In re B.S.*, 317 Ill. App. 3d 650, 665 (2000). "[T]he child[ren's] interest in a loving, stable[,] and safe home environment" might best be served by "freeing [them] for adoption," even if no one had offered, as of yet, to adopt them. *In re D.T.*, 212 Ill. 2d 347, 363-64 (2004). Nor did Wright's retention of his parental rights to F.P. necessarily preclude a finding that it would be in F.P.'s best interest to terminate respondent's parental rights. See *In re S.J.*, 233 Ill. App. 3d 88, 122 (1992); *In re S.M.*, 219 Ill. App. 3d 269, 277 (1991); *In re Sims*, 30 Ill. App. 3d 406, 412 (1975).

¶ 93     Second, respondent recounts the testimony of her relatives that the children were attached to her, and she to them, and that the children repeatedly expressed a longing to return home to her. On the other hand, Unsworth, while granting there was some attachment between respondent and the children, testified that she never heard the children express a desire to return home to respondent and that, rather, they had expressed a desire to be adopted. "The [trial] court's determination [of the children's best interest] lies within its sound discretion, especially when it considers the credibility of testimony presented at the best interests hearing; that determination will not be reversed unless it is against the manifest weight of the evidence or the trial court has abused its discretion." *In re Jaron Z.*, 348 Ill. App. 3d 239, 261-62 (2004). Even though the children were attached to their mother, and she to them, a child's feeling of attachment (705 ILCS 405/1-3(4.05)(d)(i) (West 2012)) is only one of the considerations in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2012)). Other considerations are "the physical safety and welfare of the child, including food, shelter, health, and clothing" (705 ILCS 405/1-3(4.05)(a) (West 2012)), and "the child's sense of security" (705 ILCS 405/1-3(4.05)(d)(ii) (West 2012)). One could infer, from Unsworth's testimony, that, even at their young ages, the children sensed that adoption–or, failing that, staying where they were–would be best for their welfare and security. It would be hard to disagree with that perception. The trial court did not abuse its discretion or make a finding that was against the manifest weight of the evidence when it found that terminating respondent's parental rights would be in the children's best interest.

¶ 94                                 III. CONCLUSION
¶ 95     For the foregoing reasons, we affirm the trial court's judgment.

¶ 96     Affirmed.