NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 230400-U

NO. 4-23-0400

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 20, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | No. 21JA66 |
| | ) | |
| v. | ) | Honorable |
| Detre T., | ) | Derek G. Asbury, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, granting appellate counsel's motion to withdraw and finding the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In June 2022, the State filed a petition for termination of parental rights against respondent, Detre T., the father of M.T. (born February 2021). In May 2023, the trial court granted the State's petition and terminated respondent's parental rights.

¶ 3    On appeal, appellate counsel has filed a motion to withdraw her representation of respondent pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing respondent's appeal presents no potentially meritorious issues for review. We agree with counsel. Accordingly, we grant the motion and affirm the trial court's judgment terminating respondent's parental rights.

¶ 4                                    I. BACKGROUND

¶ 5            In February 2021, the State filed a petition for adjudication of wardship, alleging the newborn M.T. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) in that the M.T.'s environment was injurious to his welfare. The petition alleged respondent had been found unfit in Peoria County case No. 18-JA-405, there had been no subsequent finding of fitness, and he had completed insufficient services to restore him to minimal parenting fitness. The petition detailed respondent's criminal history, including his pending charges in Peoria County case No. 20-CF-163, aggravated discharge of a firearm and unlawful possession of a weapon by a felon. The next day, after a shelter care hearing, the trial court found there was probable cause to believe the petition's allegations were true and, therefore, there existed an immediate and urgent necessity that M.T. be placed in shelter care. Over respondent's objection, the court issued an order placing temporary custody and guardianship of M.T. with the Illinois Department of Children and Family Services (DCFS).

¶ 6            During a February 16, 2021, hearing, respondent stated he intended to hire private counsel and answer the petition. The trial court admonished him to cooperate with DCFS, comply with the service plan, and correct the conditions which required the child to be in care or risk termination of his parental rights. The court eventually appointed respondent counsel, who in turn filed an answer denying the petition's allegations.

¶ 7            On June 14, 2021, the trial court held adjudicatory and dispositional hearings. Respondent was not present and had not communicated with his counsel. The court issued an adjudicatory order, finding, by a preponderance of the evidence, M.T. was neglected based upon respondent's previous unfitness and DCFS indications. Transitioning to the dispositional phase, the court noted caseworker Sara Picken, BSW, of the Center for Youth & Family Solutions

(CYFS), filed a dispositional report, which outlined services respondent had been ordered to complete for case No. 18-JA-405. Respondent had previously completed some services, including domestic violence classes, anger management classes, and parenting classes. He had not completed other services, including a substance abuse assessment, twice monthly drug screens, individual counseling, and obtaining a state identification. The report recommended respondent undergo a psychiatric assessment. The court's dispositional order found respondent unfit to care for, protect, train, or discipline M.T. The order required respondent to cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that required M.T. to be in care.

¶ 8 Following respondent's visit with M.T. on September 13, 2021, Picken provided respondent with a copy of the current service plan, which required him to complete a substance abuse assessment and do drug testing through Help at Home. Picken would later testify in the termination proceedings that she went over the service plan with respondent and he signed it. In a September 2021 permanency review hearing, CYFS presented a report detailing respondent's compliance with the service plan. The report documented how respondent had not complied with substance abuse services, primarily drug screenings. Respondent had not fully complied with visitation. Respondent only attended visits the mother attended. When the mother left early, respondent also left early. CYFS's report noted respondent had "not corrected the issues that brought [M.T.] into care." In November 2021, in case No. 20-CF-163, respondent was sentenced to six years in the Illinois Department of Corrections (DOC).

¶ 9 On May 2, 2022, the trial court held another permanency review hearing. CYFS submitted a permanency review report. The report noted respondent's incarceration in Hill Correctional Facility. Picken noted she was trying to set up in-person visitation for respondent

and M.T., but DOC did not allow unvaccinated persons into the facilities. The court issued an order finding respondent remained unfit. The court found the goal of returning home within one year was no longer appropriate. The court ordered the "State to consider [termination of parental rights] in the future."

¶ 10 On June 13, 2022, the State filed a petition seeking a finding of unfitness and termination of respondent's parental rights. The State alleged respondent, M.T.'s legal father, was "an unfit person *** in that he has failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of [neglect]." See 750 ILCS 50/1 D(m)(ii) (West 2022). The petition identified the nine-month period to be July 28, 2021, through April 28, 2022. The petition alleged it would be in M.T.'s best interest to terminate respondent's parental rights.

¶ 11 On December 13, 2022, the trial court held a hearing on the State's petition to terminate respondent's parental rights. The State admitted multiple exhibits pertaining to M.T., including a certified records request to Help at Home for respondent's drug screenings. The State called one witness, caseworker Picken from CYFS. Picken testified she had been the caseworker on this case before M.T. was born. She had been the caseworker in the other case involving respondent (case No. 18-JA-405). She testified the service plan in this case had been continued from the other case. Picken stated the service plan required respondent to do a substance abuse assessment, but respondent never completed one. Picken likewise testified the service plan required respondent to do drug drops. She noted she communicated these requirements to respondent during an in-person visit in March 2021 and at the child and family team meetings. She could not recall the most recent time she communicated these requirements to respondent, but she knew it was during the relevant nine-month time period and before he entered DOC. She

- 4 -

explained she had instructed respondent to do the drug testing at Help at Home and nowhere else. When asked if respondent completed any drug drops between July 28, 2021, through April 28, 2022, Picken answered no. She testified respondent had been scheduled for 45 hours of visitation and missed some time; however, the court granted respondent's hearsay objection and would not allow Picken to say exactly how many hours of visitation respondent missed. Picken testified the service plan required respondent to do individual counseling, but he had been waitlisted and had not completed the counseling.

¶ 12        On cross-examination by respondent's counsel, Picken acknowledged respondent was entitled to visitation with M.T. while incarcerated, but CYFS had not set up visits. Picken noted she had no direct communication with respondent since he entered DOC. On cross-examination by the guardian *ad litem* (GAL), Picken testified respondent signed the service plan in September 2021. On examination by the trial court, Picken explained that when parents sign a service plan, they are "signing that they received their portion of the service plan" and they "understand that [they] need to complete these services, basically, to be reunited with [the] child." At this point, respondent's counsel offered a hearsay objection to any testimony regarding the service plan, which the court overruled as untimely. Picken went on to say she explained the service plan to respondent, and he signed it. She testified M.T. was not returned to respondent during the nine-month period of July 28, 2021, through April 28, 2022. Picken further stated it was not safe to return M.T. to respondent during that nine-month period.

¶ 13        On redirect examination, Picken testified there was no time during the relevant time period where M.T. could have been returned to respondent "in the near future." She clarified she contacted DOC about scheduling visits for respondent and M.T., but the facility

housing respondent did not allow virtual visits and would not allow unvaccinated people to enter the facility.

¶ 14 Before resting its case, the State asked the trial court to take judicial notice of the initial petition, the adjudicatory and dispositional orders, and the September 21, 2021, and May 2, 2022, permanency review orders. Respondent moved for a directed finding, which the court denied. Neither respondent nor the GAL presented evidence, and the court took the matter of respondent's fitness under advisement.

¶ 15 The parties reconvened for the trial court to issue its decision on March 7, 2023. Initially, respondent was present via Zoom, but, for an unknown reason, he exited the virtual waiting room. The court proposed to continue without respondent, and no party objected. The court noted the State alleged respondent was unfit since he failed to make reasonable progress during the nine-month period of July 28, 2021, through April 28, 2022, pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)). The court observed reasonable progress is an objective standard. Citing case law, the court asserted "reasonable progress has been made if the trial court can objectively conclude that the parents' progress is sufficiently demonstrable and of such a quality that the child can be returned to the parent within the near future or has been returned."

¶ 16 The trial court began its decision by stating it found caseworker Picken credible. It also detailed the exhibits admitted and how it took judicial notice of several court orders and permanency reviews. The court noted the dispositional order required respondent "to cooperate with DCFS generally and his service plan."

¶ 17 The trial court noted CYFS never filed the service plan, but it determined evidence of the service plan came in through Picken's testimony. While the court acknowledged

- 6 -

this was not the best evidence of the service plan, it noted Picken testified, without contradiction, that she authored the service plan, she informed respondent about the service plan, and he signed it, indicating he understood the plan's requirements. The evidence showed respondent did not do drug drops during the relevant time period. Likewise, the evidence demonstrated respondent was inconsistent with visitation prior to entering DOC. The court stated:

"I think the evidence is more than clear and convincing that for the father not doing something as basic as a drug and alcohol assessment, refusing to do it, not doing any drops during the review period, inconsistent visits, and being incarcerated for a large portion of the period can't be deemed as reasonable progress to have the minor child returned to his care in the near future which is how the [Fourth] District measures or looks at what would be reasonable progress."

The court then found the State proved respondent unfit by clear and convincing evidence.

¶ 18        The trial court held a best-interest hearing on May 2, 2023. The State again called Picken as its lone witness. She again testified she had been M.T.'s caseworker since his birth. She noted M.T. had been placed in the same licensed, traditional foster home since birth. She testified the foster parents provided M.T.'s needs for food, shelter, and clothing. They also provided for M.T.'s educational and mental development. Picken testified M.T. had bonded with his foster parents because he sought them out when he was upset and when he was happy. Picken noted the foster parents provided for M.T.'s emotional needs, his safety and security, and his medical needs. She testified M.T. had asthma and the foster parents took him to the doctor regularly. Picken stated the foster parents supported M.T.'s background, including his family,

culture, and identity. She testified the foster parents ensure M.T. feels loved and secure. Picken reiterated M.T. shared a strong bond with his foster parents, but he had no relationship with respondent. Picken testified the foster parents were willing to adopt M.T. and provide him with permanency. She stated she recommended adoption. Upon questioning from the court, Picken testified M.T. was placed with his full sibling and his half-sibling.

¶ 19 Respondent testified in opposition to termination. He confirmed he was incarcerated at Hill Correctional Center. He stated he had not seen M.T. since he entered DOC. He stated there was nothing he could do to initiate contact with M.T. since he did not have contact with the foster parents. He stated no one from any DCFS agency had contacted him about doing services in DOC, aside from one person contacting him when he first entered prison. He said that one person talked to him about the services he needed to complete, "but it's nothing I can do down here for that—for the plans." Respondent testified the only information he received about M.T. came from the biological mother. Respondent stated he was scheduled to be released from DOC on December 15, 2026. He testified he wanted to raise M.T. as his own son.

¶ 20 On cross-examination by the State, respondent testified he had not sent M.T. any gifts or correspondence. He explained the prison commissary had no gifts and no supplies for letter writing. Respondent testified he had no contact with M.T. while in DOC. On cross-examination by the GAL, respondent noted he had previously been on phone calls with M.T. and the biological mother during her visits with M.T.

¶ 21 Before rendering its decision, the trial court stated it considered the statutory best-interest factors. The court went on to state: "On the balance of those factors, you have a child that from birth has only known one home, and that is the home of the foster parent[s]. They have done all the day-to-day lifting as it relates to the child. All the child's needs have been met

exclusively by them." The court highlighted that M.T.'s medical needs were met, and he had been placed with his siblings. The court noted respondent would not be released from DOC for another three years and would still need to complete services before M.T. could be returned to him. The court anticipated M.T. would be over six years old before he could be placed in respondent's care. The court determined it would be unreasonable to have the child wait years for permanency. The court concluded, "So, I will find that the balance of those factors in the statute by preponderance of the evidence overwhelmingly favor the termination of [respondent's parental] rights." It went on to explain, "[G]iven [the circumstances] and where we're at with this case, it's just not practical or viable or in the child's best interest" to continue the parent-child relationship.

¶ 22        Respondent filed a notice of appeal, and the trial court appointed counsel to represent him.

¶ 23        This appeal followed.

¶ 24                    II. ANALYSIS

¶ 25        Counsel moves to withdraw as appellate counsel for respondent. In the motion, counsel states she read the record and concluded there exist no viable or meritorious grounds for appeal. Counsel further states she advised respondent of her opinion. Counsel supports the motion with a memorandum of law providing a statement of facts, a discussion of potential issues, and arguments why those issues lack arguable merit. This court advised respondent he had until July 28, 2023, to respond to the motion, and respondent did not do so.

¶ 26        Counsel submits there are no irregularities or errors in the trial process that might provide meritorious grounds for appeal. She focuses on the trial court's unfitness and best-interest determinations. Counsel specifically argues (1) the court rightly found respondent failed

to make reasonable progress within the relevant nine-month period to correct the conditions that brought M.T. into care and (2) the court rightly determined it was in M.T.'s best interest to terminate respondent's parental rights. Our review of the record and the applicable law leads us to conclude counsel is correct.

¶ 27 The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998)).

¶ 28 A. Unfitness Finding

¶ 29 "The State must prove parental unfitness by clear and convincing evidence." (Internal quotation marks omitted.) *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011). The Adoption Act provides several grounds on which a trial court may find a parent "unfit," including the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2022)). As it is used in section 1(D)(m)(ii) of the Adoption Act, "reasonable progress" means "measurable or demonstrable movement toward the goal of the return of the child." *In re L.L.S.*, 218 Ill. App. 3d 444, 460-61, 577 N.E.2d 1375, 1386-87 (1991). We have previously described " 'reasonable progress' [a]s an 'objective standard,' " measuring whether " 'the progress being made by a parent to comply with directives given for the return of

the child is sufficiently demonstratable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461).

¶ 30        Because trial courts gauge reasonable progress objectively and not based on a parent's subjective circumstances, "[t]ime in prison is included in the nine-month period during which reasonable progress must be made." *F.P.*, 2014 IL App (4th) 140360, ¶ 89. In other words, a parent's time spent in prison does not toll the nine-month period. Incarceration is no excuse for not making reasonable progress. See *In re K.H.*, 346 Ill. App. 3d 443, 455, 804 N.E.2d 1108, 1118 (2004) (acknowledging the reasonable progress standard may seem harsh but explaining its purpose is to "abate the harm that a perpetual lack of permanency inflicts on children").

¶ 31        This court pays "great deference" to a trial court's fitness finding "because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *A.L.*, 409 Ill. App. 3d at 500. We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts" (internal quotation marks omitted) (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91), we now turn our attention to the facts of this case.

¶ 32        Based on a careful review of the record, we agree with counsel there is no issue of arguable merit concerning the trial court's unfitness finding. The State alleged, and the trial court found, respondent was unfit based on one statutory ground: failure to make reasonable progress toward the return of M.T. to respondent during the nine-month period of July 28, 2021, through April 28, 2022. See 750 ILCS 50/1(D)(m)(ii) (West 2022). During the relevant time period,

respondent's service plan required him to complete a substance abuse assessment, undergo twice-monthly drug screening, participate in visits with M.T., and cooperate with DCFS and CYFS.

¶ 33　　　　The State's evidence showed respondent completed no services and made no measurable progress toward having M.T. returned to him during the relevant time period. See generally *L.L.S.*, 218 Ill. App. 3d at 460-61. Visit notes and Picken's testimony revealed respondent's visitation with M.T. was inconsistent, at best. He attended visits only when M.T.'s mother attended, and if the mother left early, then respondent did too. He did not complete a substance abuse assessment, nor did he complete any drug drops from July 2021 through April 2022. And, of course, the evidence showed respondent was incarcerated in DOC in November 2021 and would not be released until December 2026. Picken, whom the trial court found credible, testified that at no point between July 28, 2021, and April 28, 2022, would she have been able to return M.T. to respondent's care in the near future. See generally *F.P.*, 2014 IL App (4th) 140360, ¶ 88. Respondent's claims that he had not been able to participate in services since entering DOC ring hollow because he did not engage in services before being incarcerated. Even so, he must still make reasonable progress while in prison. *F.P.*, 2014 IL App (4th) 140360, ¶ 89. This evidence of respondent's noncompliance and incarceration stood uncontested before the trial court when it found respondent unfit. We observe the court applied *F.P.*'s definition of reasonable progress as an objective standard measuring whether the child can be returned to the parent in the near future in finding respondent to be an unfit person. *F.P.*, 2014 IL App (4th) 140360, ¶ 88. We defer to the court's unfitness finding. *A.L.*, 409 Ill. App. 3d at 500.

¶ 34　　　　Taken together, all the evidence relating to respondent proves clearly and convincingly that he failed to make reasonable progress between July 28, 2021, and April 28,

2022, and was an unfit person as defined by the Adoption Act. See *A.L.*, 409 Ill. App. 3d at 500; *L.L.S.*, 218 Ill. App. 3d at 460-61. By failing to complete any services, respondent showed no demonstrable movement toward having M.T. returned to his custody in the near future. See *F.P.*, 2014 IL App (4th) 140360, ¶ 88; *L.L.S.*, 218 Ill. App. 3d at 460-61. And since the evidence does not point to the opposite result, the court's unfitness finding that respondent failed to make reasonable progress toward M.T.'s return home during the relevant nine-month time period following the neglect adjudication does not stand against the manifest weight of the evidence. *A.L.*, 409 Ill. App. 3d at 500.

¶ 35                                    B. Best-Interest Determination

¶ 36          Once a trial court finds a parent an "unfit person," it must consider whether terminating that person's parental rights serves the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating that once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child").

¶ 37          When considering whether termination of parental rights serves a child's best interest, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2022). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
>
> the child's identity; (3) the child's familial, cultural[,] and religious
>
> background and ties; (4) the child's sense of attachments, including
>
> love, security, familiarity, continuity of affection, and the least

- 13 -

disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123, 141 (2006).

See 705 ILCS 405/1-3(4.05) (West 2022).

¶ 38 A trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 39 After careful review of the record, we agree with counsel there is no issue of arguable merit regarding the trial court's best-interest finding. The evidence established it was in M.T.'s best interest to terminate respondent's parental rights. The record showed M.T. was two years old at the time of the best-interest hearing and had spent his entire life in the same foster home with his biological siblings. Picken testified the foster parents provided all of M.T.'s needs—food, shelter, clothing, safety, security, education, and medical treatment. She likewise stated the foster parents supported M.T.'s development, identity, background, and culture.

- 14 -

Picken testified M.T. had a strong bond with his foster parents, evidenced by him going to them when he was happy or upset.

¶ 40　　　　Based on this evidence, the trial court found it was in the minor's best interest to terminate respondent's parental rights. Accordingly, we cannot say "the opposite conclusion is clearly apparent," nor can we find the court's decision to be "unreasonable, arbitrary, or not based on the evidence." *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 41　　　　　　　　　　　　　　III. CONCLUSION

¶ 42　　　　After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel this appeal presents no issue of arguable merit. Accordingly, for the reasons stated, we grant the motion to withdraw as appellate counsel and affirm the trial court's judgment.

¶ 43　　　　Affirmed.