**NOTICE**
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190582-U

NO. 4-19-0582

FILED
December 23, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* R.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
|       Petitioner-Appellee, | ) | No. 17JA212 |
|       v. | ) | |
| Chelsea M., | ) | Honorable |
|       Respondent-Appellant). | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1      *Held*: The trial court did not err in terminating respondent's parental rights or denying her
         motion for a continuance.

¶ 2      On August 26, 2019, the trial court terminated the parental rights of respondent,

Chelsea M., to her child, R.M. (born February 8, 2013). Respondent appeals, arguing the court

erred in finding her unfit, in finding that termination of her parental rights was in R.M.'s best

interest, and in denying her motion for a continuance. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On September 25, 2017, the State filed a petition to adjudicate wardship, alleging

R.M. was (1) a neglected minor in that she was "not receiving the proper or necessary care

recognized under state law as necessary for [her] well-being"; (2) a neglected minor in that her

"environment [was] injurious to her welfare"; and (3) an abused minor in that respondent "create[d] a substantial risk of physical injury to [her]." The State further alleged respondent had "substance abuse, mental health, domestic violence, and lack of supervision of the minor (while under the influence) issues."

¶ 5        On September 26, 2017, the trial court entered an order transferring temporary custody of R.M. to the Illinois Department of Children and Family Services (DCFS).

¶ 6        On October 24, 2017, Lutheran Child and Family Services (LCFS), a contract agency acting on behalf of DCFS, filed a "Family Service Plan" (service plan). The service plan stated R.M. had been placed in a foster home in Kankakee, Illinois, after she was removed from respondent following respondent's arrest for domestic battery. According to the service plan, R.M. witnessed the incident of domestic battery. The service plan also indicated that respondent tested positive for cocaine and marijuana subsequent to the incident and that both respondent and her family members reported she had a history of mental health issues.

¶ 7        The permanency goal set forth in the service plan was "return home within 12 months." According to the service plan, respondent was to (1) "maintain a substance free lifestyle" by "complet[ing] a substance abuse assessment and follow[ing] all recommendations" and "attend[ing] and pass[ing] all random toxicology tests when requested to do so"; (2) "achieve and maintain her mental health to ensure the safety and well being of her child" by "complet[ing] a mental health assessment" and "follow[ing] all recommendations as a result of her mental health assessment"; (3) "be able to provide for all the needs of her child safely" by "complet[ing] a parenting assessment to determine if and what parenting education classes [were] needed," "attend[ing] and complet[ing] all parenting classes," "be[ing] able to demonstrate the parenting

skills she has learned in parenting classes through her visits with her child," "obtain[ing] and maintain[ing] a legal means of income and provid[ing] proof of employment to [her] caseworker on a monthly basis," and "obtain[ing] appropriate and clean housing that [was] stable for her child to live in and maintain for at least six months"; (4) "complete a domestic violence program in order to learn to provide a safe environment for herself and her child" by "agree[ing] to attend an assessment for a domestic violence program and to be open and honest during the assessment," "agree[ing] to follow all recommendations stemming from the domestic violence assessment," and "agree[ing] to demonstrate an ability to identify and engage in healthy, non-violent relationships"; and (5) "participate with DCFS/LCFS" by "agree[ing] to participate and complete the Integrated Assessment," "agree[ing] to keep all appointments with DCFS/LCFS and meet[ing] with the caseworker on a scheduled and unscheduled basis," "agree[ing] to keep DCFS/LCFS informed of all changes in address, phone number, employment, or household composition within 24 hours," and "agree[ing] to sign all releases of information."

¶ 8        On December 19, 2017, the trial court entered an adjudicatory order, finding the State had proved that, due to the actions of respondent, R.M. was an abused and neglected minor as alleged in the State's petition. The same day, the court entered its dispositional order finding the service plan, the services recommended in the service plan, and the permanency goal established in the service plan to be appropriate. R.M. was made a ward of the court and placed in the custody of DCFS. The court also ordered that respondent "cooperate with [DCFS]" and "comply with the terms of the service plan and correct the conditions that require[d] [R.M.] to be in the [*sic*] care."

¶ 9        On January 18, 2019, the State filed a motion seeking to terminate respondent's

- 3 -

parental rights. (We note the State also sought to terminate the parental rights of R.M.'s legal father and her biological father and that, ultimately, those individuals' parental rights were terminated; however, those individuals are not a party to this appeal and we discuss the facts only as they relate to respondent and R.M.) The State alleged respondent was unfit for having (1) "failed to maintain a reasonable degree of interest, concern, or responsibility as to [R.M.]'s welfare" (750 ILCS 50/1(D)(b) (West 2018)), (2) "failed to make reasonable efforts to correct the conditions that were the basis for the removal of [R.M.] from [respondent] during any 9-month period following the adjudication of neglect and/or abuse" (750 ILCS 50/1(D)(m)(i) (West 2018)), (3) "failed to make reasonable progress toward the return of [R.M.] to [respondent] during any 9-month period following the adjudication of neglect and/or abuse" (750 ILCS 50/1(D)(m)(ii) (West 2018)), the relevant time period being December 19, 2017, through September 19, 2018, and (4) "failed to make reasonable progress toward the return of [R.M.] to [respondent] during any 9-month period following the adjudication of neglect and/or abuse" (*id.*), the relevant time period being April 18, 2018, through January 18, 2019. The State further alleged that termination of respondent's parental rights was in the best interests of R.M.

¶ 10        On July 29, 2019, the trial court conducted the unfitness hearing. The State's only witness was April Ettien, a foster care case manager at LCFS and the caseworker in charge of R.M.'s case since its inception. Ettien testified that, as part of the service plan, respondent was to complete "[p]arenting, domestic violence, and substance abuse, mental health" services. According to Ettien, between December 2017 and January 2019, respondent "did not complete parenting [services]." Ettien testified respondent did seek a domestic violence assessment on June 21, 2018, but was denied services from one agency due to her history of domestic battery.

Respondent was referred to a second domestic violence agency a few days later but "did not engage in that service." Ettien also testified respondent completed two assessments for substance abuse and mental health, one on October 11, 2017, and another on April 13, 2018. Both assessments "recommended Level 2 treatment, individual group counseling, case management, toxicology screens, therapy, [and] counseling to learn behavioral cognitive skills." Ettien stated the substance abuse and mental health services were not completed prior to January 18, 2019. Ettien's summary of respondent's progress in her service plan was that respondent completed "section[s] of [a] whole goal. But not a complete goal."

¶ 11　　　　When questioned about respondent's visits with R.M., Ettien testified that respondent did not visit R.M. "for the first six months of the case" because respondent "was in and out of the Macon County jail and did not have a stable phone number or address for me to contact her." From the beginning of respondent's case until June 2018, respondent attended 4 out of 27 visits with R.M. After June 2018, respondent was assigned a case aide who provided transportation to her visits with R.M. After the case aide was assigned, respondent attended three out of eight visits with R.M., the last of which was in August 2018. The visits respondent attended and Ettien supervised "went fine."

¶ 12　　　　Ettien testified that she did not feel respondent "me[t] minimal parenting standards," nor that "within the next *** three to six months *** she would be able to if she did all of her services."

¶ 13　　　　On cross-examination, Ettien testified that respondent had undergone a parenting assessment which indicated that respondent did not need to take any parenting classes and that, as a result, respondent was "done with the parenting portion." Ettien also acknowledged that R.M.

had been placed in foster care in Kankakee and that "transportation [was] an issue [respondent] struggled with." According to Ettien, after the case aide was assigned to respondent's case, the case aide would pick up respondent "in different places." The case aide was required to "driv[e] all over Decatur trying to find [respondent]." After respondent requested the case aide pick her up in Shelbyville, it was decided "that it would be better if [respondent] just met at the [LCFS] office with the case aide and they could go to Kankakee together." Once this decision was made, respondent "stopped visiting." Ettien also testified that she was unaware respondent "had completed about eight hours of either mental health [or] substance abuse treatment between the periods of February 2018 through July 2018."

¶ 14    R.M.'s guardian *ad litem* then questioned Ettien further regarding the transportation arrangement between respondent and the case aide. Ettien explained that, although respondent lived in Blue Mound, Illinois, the case aide "reported that she would be picking her up in Decatur." Ettien believed the case aide was picking up respondent from respondent's friend's house. Ettien further testified that, when the case aide was picking up respondent, as opposed to the two meeting at the LCFS office, respondent was "consistent" in her visits with R.M.

¶ 15    On redirect, Ettien testified that, pursuant to respondent's substance abuse and mental health assessment, respondent was to complete "substance abuse Level 2" treatment. To complete Level 2 treatment, respondent was required to receive up to 24 hours of treatment per week. Ettien testified that the eight hours referenced by respondent's counsel would "maybe be a week" of treatment.

¶ 16    Respondent testified on her own behalf. Respondent confirmed that she was denied a domestic violence assessment by the first service agency and was referred to the second agency.

Respondent testified that, at the time she received the referral to the second agency, she "was having transportation issues," but that she had an upcoming appointment with that agency in August 2019. Respondent also testified that none of the required services were available to her in Blue Mound, where respondent stated she was living at that time. Regarding the substance abuse and mental health therapy, respondent testified she completed "7.93 hours of treatment," that she "was required to attend one hour per week," and that she "was doing two per week when able to get to town." Respondent also testified she had "never been in Shelbyville during a visit" with R.M. and that she did not have the means to get from Decatur to Kankakee to visit R.M. absent a ride from the LCFS case aide. Respondent stated, if given the opportunity, she could "complete services within three to six months."

¶ 17      Respondent admitted to missing five "drug drops" due to transportation issues, though she testified she rescheduled "half of those."

¶ 18      The trial court ultimately found respondent unfit based on each ground alleged by the State. At the conclusion of the hearing, the court scheduled a best interest hearing and ordered LCFS to prepare a best interest report.

¶ 19      LCFS filed a best interest report on August 23, 2019. The report indicated R.M. was happy and healthy and recently had been placed in a "fictive kin adoptive home." The foster parents were familiar with R.M. because they both worked in the school R.M. attended and R.M. had spent time in their home prior to her placement there. According to the report, since her placement, R.M. "ha[d] become part of" the foster parents' family and was "doing wonderfully." The report stated R.M. was well cared for and the foster parents were "committed to providing [R.M.] with permanency."

¶ 20          On August 26, 2019, the trial court conducted the best-interest hearing. The court began by noting that respondent was not present. Respondent's counsel moved for a continuance and informed the court as follows:

> "[Respondent] called my office this morning. She has been back in Wisconsin, and if you recall the last hearing, she had suffered a stroke in Wisconsin and had been getting treatment up there. Well, she's back there again to receive outpatient treatment. She indicated that because the outpatient treatment is ongoing that she would be unable to be here for the hearing. *** She's also expressed some concern that she may [have] had another stroke. I asked for medical documentation. I waited in my office until about 1:27[;] I still had not received anything from her."

The court denied counsel's motion to continue, stating,

> "I think we need to reach some level of permanency here. No disrespect to your client. You get medical documentation or some information of the contrary and you want to walk it in and let me take a look at it, but, I mean, this was set for hearing all the way back on July 29 so about a month ago so it should have been plenty of time I would think to get documentation to you but be that as it may, if you receive something, want me to take a second look at it, I will do so but for today the motion is denied."

¶ 21          April Ettien again testified as the State's only witness. Ettien testified R.M. was "doing very well" in her prospective adoptive home. R.M. had become "fully integrated into the household." R.M. was doing well in school. The foster family was involved in the community, was willing to adopt R.M., and was "able to provide for [R.M.] for food, clothing, shelter, [and]

education." Ettien also testified she had no contact with respondent since the fitness hearing. In Ettien's opinion, it was in R.M.'s "best interest to be adopted by her current foster family."

¶ 22 On cross-examination, Ettien confirmed that R.M. had previously been in a different foster home in Kankakee and had only been in the prospective adoptive home "two or three weeks." Ettien also testified R.M. had done "respite" in the prospective adoptive home several times before her placement there.

¶ 23 Before resting, the State requested the court to also consider the best interest report. Respondent presented no evidence.

¶ 24 The trial court found that it was in R.M.'s best interest that respondent's parental rights be terminated.

¶ 25 This appeal followed.

¶ 26 II. ANALYSIS

¶ 27 On appeal, respondent argues the trial court's finding that she was an unfit parent and its finding that it was in the best interests of R.M. to terminate respondent's parental rights were against the manifest weight of the evidence. Respondent also argues the court erred in denying her motion for a continuance despite respondent having been "absolutely unable to attend the hearing due to a serious medical condition."

¶ 28 A. Termination of Parental Rights

¶ 29 Pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29(2) (West 2018)), a trial court may terminate parental rights where it finds, by clear and convincing evidence, that a parent is unfit based on grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) and that termination is in the minor's best interest.

*In re M.I. v. J.B.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69. On review, the court's determination that a parent is unfit will not be disturbed unless it is against the manifest weight of the evidence. *Id.* ¶ 21. A court's decision "is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *Id.*

¶ 30        Here, the trial court determined respondent was unfit based upon each of the four grounds alleged by the State. However, we need only consider whether any single ground of unfitness was sufficiently proven. See *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006) ("Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any one ground, properly proven, is sufficient to enter a finding of unfitness.").

¶ 31        The record amply supports the trial court's finding that respondent failed to make reasonable progress toward the return of R.M. from December 19, 2017, to September 19, 2018. "Reasonable progress" requires "measurable or demonstrable movement toward the goal of reunification." *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1051, 796 N.E.2d 1175, 1183 (2003). Reasonable progress is measured by considering a "parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001). Service plans are an integral part of the statutory scheme, and compliance with the service plan is intimately tied to a parent's progress toward the return of the child. *Id.* at 216. The failure to make reasonable progress includes the failure to substantially fulfill the terms of the service plan. *Id.* at 216-17.

¶ 32        A parent makes reasonable progress toward the return of her child when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future,* will be able to order the child returned to parental custody." (Emphasis in original.) (Internal quotations omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227. Whether a parent has made reasonable progress is determined using an objective standard. *Id.*

¶ 33        Here, the trial court's directive to respondent was that she "comply with the terms of the service plan and correct the conditions that require [R.M.] to be in the [*sic*] care." Notwithstanding the court's directive, respondent failed to complete or substantially fulfill the terms of most of the goals in her service plan during the nine-month period from December 19, 2017, through September 19, 2018.

¶ 34        We note, as an initial matter, that respondent may have been prevented from completing some of the goals in her service plan because she was "in and out of the Macon County jail." However, respondent's incarceration does not absolve her from her obligation to make reasonable progress toward reunification with R.M. See *In re J.L.*, 236 Ill. 2d 329, 340, 924 N.E.2d 961, 967 (2010).

¶ 35        The first goal set forth in the service plan was for respondent to maintain a substance-free lifestyle by completing a substance abuse assessment, following all recommendations therefrom, and attending and passing all random toxicology tests when requested to do so. Respondent completed two assessments. However, she failed to attend the required therapy, only attending 7.93 hours over a five-month period, far short of the requirement to attend up to 24 hours of therapy per week. She also failed to attend five scheduled drug drops.

¶ 36        Respondent's second goal was to achieve and maintain her mental health to ensure the safety and well-being of her child by completing a mental health assessment and following all recommendations resulting therefrom. Although respondent completed a mental health assessment, she did not complete the required hours of therapy.

¶ 37        The third goal required respondent to complete a parenting assessment to determine what parenting education classes she needed. From the record, it appears respondent attended a parenting assessment and it was determined she did not require parenting classes.

¶ 38        Respondent was also to complete a domestic violence assessment and comply with the recommendations thereof. Respondent did not attempt to complete a domestic violence assessment until June 2018. When she was denied an assessment at the first service agency, she was referred to a different agency, which respondent apparently made no attempt to contact until late in 2018 or at some point in 2019.

¶ 39        Finally, respondent was to keep DCFS/LCFS informed of all changes in address, phone number, employment, or household composition within 24 hours. Ettien testified that, from September 2017 until March 2018, respondent did not have a stable phone number or address for LCFS to contact her.

¶ 40        Based on our review of the record, respondent made only minimal progress toward achieving the goals set forth in her service plan between December 19, 2017, and September 19, 2018, and, as the trial court concluded, it was unlikely respondent and R.M. could have been reunited in the near future. Therefore, we find that the court's finding of unfitness was not against the manifest weight of the evidence.

¶ 41        Following a finding of parental unfitness, the trial court proceeds with the best-

interest stage of termination proceedings where it "must give full and serious consideration to the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290 (2009). During this second stage of proceedings, the State has the burden of proving that termination is in the minor's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004). The Juvenile Court Act sets forth various factors for a trial court to consider when making a best-interest determination. 705 ILCS 405/1-3(4.05) (West 2018). Those factors, which must be considered in the context of the child's age and developmental needs, include (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. *Id.*

¶ 42        "[A] reviewing court will not reverse a trial court's best-interest determination unless it is against the manifest weight of the evidence." *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate [the court] should have reached the opposite result." *Id.*

¶ 43        The unrebutted evidence presented at the best interest hearing indicated that R.M. was doing well in her prospective adoptive home. Although, as respondent notes, R.M. was only placed into the relevant foster home two or three weeks prior to the best interest hearing, R.M. was familiar with the family prior to her placement there: both foster parents had worked in R.M.'s school and R.M. spent time at their home during periods of respite for R.M.'s previous foster family. According to Ettien, R.M. was "fully integrated into the household" and the foster family

was "committed to providing [R.M.] with permanency," had indicated a desire to adopt her, and was "able to provide for [her] for food, clothing, shelter, [and] education." Ettien opined that it was in R.M.'s best interest "to be adopted by her current foster family."

¶ 44        Based on the foregoing, the trial court's determination that it was in R.M.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 45                                    B. Continuance

¶ 46        Respondent's final contention on appeal is that the trial court erred in denying her motion to continue the best interest hearing. We review the court's decision to deny a motion to continue under the abuse of discretion standard. See *In re M.R.*, 393 Ill. App. 3d 609, 619, 912 N.E.2d 337, 346 (2009). A court "abuses its discretion when no reasonable person would agree with its decision." *In re M.P.*, 408 Ill. App. 3d 1070, 1073, 945 N.E.2d 1197, 1200 (2011).

¶ 47        Except as stated therein, Illinois Supreme Court Rules 900 through 920 apply to child custody proceedings which, as here, are brought under article II of the Juvenile Court Act. Ill. S. Ct. R. 900(b)(2) (eff. Mar. 8, 2016). Illinois Supreme Court Rule 901(c) (eff. July 1, 2018) addresses continuances and provides as follows:

> "Parties, witnesses and counsel shall be held accountable for attending hearings in child custody and allocation of parental responsibilities proceedings. Continuances shall not be granted in child custody and allocation of parental responsibilities proceedings except for good cause shown and may be granted if the continuance is consistent with the health, safety and best interests of the child. The party requesting the continuance and the reasons for the continuance shall be documented in the

record."

¶ 48 Here, at the commencement of the best interest hearing, respondent's counsel informed the trial court that respondent was in Wisconsin where she was receiving treatment for a prior stroke. Counsel also informed the court that respondent may have had another stroke. Respondent did not provide her counsel with corroborating documentation despite counsel's request for it several hours prior to the hearing. The court denied respondent's motion, noting that respondent had nearly a month to inform the court she would be unable to attend the scheduled hearing. However, the court stated that if respondent's counsel could provide the court with medical documentation that confirmed respondent's health issues, it would review it. Apparently, respondent never provided the court with any such documentation.

¶ 49 The court's decision to deny respondent's motion to continue was not an abuse of discretion. Respondent failed to timely inform the court she would be unable to attend the best interest hearing and to provide proof of her medical treatment for the court's review. In these circumstances, respondent failed to show good cause for a continuance.

¶ 50                                   III. CONCLUSION

¶ 51 For the reasons stated, we affirm the trial court's judgment.

¶ 52 Affirmed.