NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190865-U

NO. 4-19-0865

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* V.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
|     Petitioner-Appellee, | ) | No. 17JA52 |
|     v. | ) | |
| Anthony H., | ) | Honorable |
|     Respondent-Appellant). | ) | Brett N. Olmstead, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justice Cavanagh concurred in the judgment.
Justice DeArmond specially concurred.

**ORDER**

¶ 1     *Held*:   The circuit court's finding respondent was unfit under section 1(D)(m)(ii) of
the Adoption Act was not against the manifest weight of the evidence.

¶ 2     In August 2019, the State filed a motion for the termination of the parental rights

of respondent, Anthony H., as to his minor child, V.H. (born in October 2010).  After an October

2019 hearing, the Champaign County circuit court found respondent unfit.  At a November 2019

hearing, the court held a best-interests hearing and concluded it was in V.H.'s best interests to

terminate respondent's parental rights.

¶ 3     Respondent appeals, asserting the circuit court erred by finding him unfit.  We

affirm.

¶ 4                                      I. BACKGROUND

¶ 5     V.H.'s mother is Marcelene R., who is not a party to this appeal.  In September

2017, the State filed a petition for the adjudication of wardship, alleging V.H. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2016)), in that her environment was injurious to her welfare when she resided with Marcelene or respondent because said environment exposed V.H. to substance abuse. At a December 2017 hearing, the circuit court accepted Marcelene's stipulation and admission V.H. was neglected as alleged in the petition. The court's order also described Marcelene's and defendant's substance abuse issues. After a January 2018 dispositional hearing, the court entered a dispositional order finding both respondent and Marcelene fit and allowing V.H. to remain in their custody. However, the court adjudicated V.H. neglected and made her a ward of the court.

¶ 6        In June 2018, the circuit court entered a warrant of apprehension for V.H. due to respondent's incarceration and Marcelene's positive drug screen. The State then filed a motion to declare respondent and Marcelene unfit to have custody and guardianship of V.H. After a June 2018 hearing, the court found respondent was unfit and unable to care for V.H. The court continued custody of V.H. with Marcelene. However, the court removed guardianship from both parents and placed V.H.'s guardianship with the Department of Children and Family Services (DCFS). In July 2018, the court found Marcelene was unfit and unable to care for V.H., removed V.H. from her custody, and placed V.H.'s custody with DCFS.

¶ 7        In August 2019, the State filed a motion to terminate respondent's and Marcelene's parental rights to V.H. The motion asserted respondent was unfit because he (1) failed to make reasonable progress toward V.H.'s return during any nine-month period after the neglect adjudication, specifically September 15, 2018, to June 15, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (2) is incarcerated as a result of a criminal conviction, has

repeatedly been incarcerated as a result of criminal convictions, and his repeated incarceration has prevented him from discharging his parental responsibilities for V.H. (750 ILCS 50/1(D)(s) (West 2018)); and (3) is depraved in that he had been criminally convicted of at least three felonies and at least one of the convictions had taken place within five years of the motion's filing (750 ILCS 50/1(D)(i) (West 2018)). In October 2019, Marcelene executed a final and irrevocable surrender of her parental rights to V.H.

¶ 8    On October 17, 2019, the circuit court held the fitness hearing. The State presented the testimony of Ashley Nailing, the caseworker. It also presented certified copies of respondent's conviction for (1) aggravated battery in Coles County case No. 03-CF-285, (2) aggravated battery in Coles County case No. 03-CF-296, (3) possession of a deadly substance and possession of a manufacturing chemical in Coles County case No. 04-CF-397, (4) resisting a peace officer in Coles County case No. 12-CF-80, and (5) possession of methamphetamine in Coles County case No. 18-CF-299. The State also asked the court to take judicial notice of two of respondent's other convictions already contained in the court file, and the court did so. Those convictions were for aggravated stalking in Coles County case No. 06-CF-338 and possession of a methamphetamine precursor in Coles County case No. 14-CF-117. Additionally, the State asked the court to take judicial notice of the prior order in this case, and the court did so. Respondent testified on his own behalf and presented the testimony of his father, Frank Inman.

¶ 9    Nailing testified she was the caseworker in V.H.'s case from July 2018 to June 2019. When she took over the case, respondent was incarcerated in the Coles County jail. Nailing met with respondent in the later part of July 2018 and spoke with him about the services he needed to complete. She told respondent he needed to (1) successfully complete drug treatment and follow any recommendations and (2) complete parenting classes. Once respondent

was released from jail, he would need to consult with the team to see what other services would be beneficial for V.H.'s return. Nailing explained addressing substance abuse was respondent's first priority. Nailing testified respondent told her none of the services required by the service plan were available to him while he was in jail. Respondent did indicate he would engage in services if they were made available to him in jail. Nailing testified she did not speak to any service providers to see if they were willing to work with respondent in jail. She also did not speak with respondent about whether he could be released on a furlough to complete treatment.

¶ 10   Around September 2018, respondent was released to Our House, a drug treatment facility. While in Our House, Nailing was able to communicate with respondent via telephone. Respondent only remained in Our House for two to three weeks. Respondent told Nailing he did not complete the program because he had used methamphetamine. Respondent returned to the Coles County jail and remained there until Nailing departed from her employment on June 17, 2019. While in jail, respondent expressed a willingness to participate in services, but he never reached the point to where he was successful enough in treatment to be able to discuss the next steps to complete services. Additionally, respondent declined visitation with V.H. while he was in jail. Respondent explained to Nailing he did not want V.H. to see him in jail. During her time as the caseworker, Nailing was never able to make plans to return V.H. to respondent.

¶ 11   Inman testified he had a close relationship with respondent when respondent was growing up and had been consistently in contact with respondent. The only exception was when Inman himself was incarcerated from 2003 to 2006. Inman testified he had a family history of addiction and had been clean and sober since 2001. Respondent was released from prison in September, and Inman helped him with a house fire that happened shortly after respondent's release. Respondent and Inman had talked pretty much daily on the telephone. Inman had

encouraged respondent to have pride in the little things, like being employed and paying bills. With respondent's last incarceration, Inman had noticed a "huge difference" in respondent's attitude and demeanor. Respondent took responsibility for messing up and stated he had lived this life long enough. Inman believed respondent was committed to staying sober. To his knowledge, respondent had stayed sober since being released from jail. While respondent had only been out three weeks, Inman had noticed respondent immediately filled out job applications and stated he was going to get a substance-abuse evaluation to provide him with a support team. Inman testified he would be a support person for respondent. Additionally, Inman testified respondent was committed to his children and deserved one last chance with V.H.

¶ 12 Respondent testified he was present at V.H.'s birth and had celebrated approximately five of her birthdays with her. He usually saw V.H. weekly and the length of the visit depended on Marcelene. Even when he was incarcerated, respondent's girlfriend of 12 years would visit with V.H. to keep a relationship with her. From 2014 to 2016, V.H. lived with respondent, his girlfriend, and their children. In 2016, respondent went back to prison, and V.H. returned to living with Marcelene. While he was in prison, respondent did not have contact information for V.H. When he was released from prison in September 2017, respondent was able to contact Marcelene and resume visits with V.H. He again had weekly visits with V.H. Respondent was again incarcerated in May 2018 and decided he did not want V.H. to visit him in jail.

¶ 13 Since his release in September 2019, respondent had filled out several job applications but had yet to obtain a job. Respondent was currently on parole, and his parole conditions included the following: (1) substance-abuse treatment, (2) house arrest, (3) "stay out of trouble," and (4) "stay clean and sober." Respondent already had an appointment scheduled

for substance-abuse treatment at a new facility in hopes he will take it more seriously. Respondent explained he had a long reflection about his life when he was returned to jail after only being out three weeks. Respondent realized his lifestyle was not doing anything for him and he was going nowhere. After that realization, he changed his mind set. Respondent now wants more for himself and his children. He has taken responsibility for his addiction and is staying away from old friends. Respondent has a support system to help him stay sober and to help him with V.H. Respondent wants to be a good father to V.H.

¶ 14 After hearing the parties' and the guardian *ad litem*'s arguments, the circuit court found respondent unfit based on all three of the allegations in the State's termination motion.

¶ 15 On November 21, 2019, the circuit court held the best-interests hearing. The evidence consisted of best-interest reports by the case manager and the Court Appointed Special Advocates. Respondent's counsel updated the reports by noting respondent had been engaging in mental health and drug counseling at LifeLinks. Respondent's counsel also asked the court to take judicial notice of respondent's and Inman's testimony at the fitness hearing and presented the court with a letter by defendant. After hearing the parties' and the guardian *ad litem*'s arguments, the circuit court found it was in V.H.'s best interests to terminate respondent's parental rights. That same day, the court entered a written order terminating respondent's parental rights to V.H.

¶ 16 On December 4, 2019, respondent filed a notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of this appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff.

Nov. 1, 2017).

¶ 17                                    II. ANALYSIS

¶ 18          Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West

2018)), the involuntary termination of parental rights involves a two-step process. First, the

State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in

section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Donald A.G.*, 221 Ill.

2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then

the State must prove by a preponderance of the evidence it is in the minor child's best interests

that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228

(2004). In this case, respondent challenges only the circuit court's unfitness finding.

¶ 19          Since the circuit court has the best opportunity to observe the demeanor and

conduct of the parties and witnesses, it is in the best position to determine the credibility and

weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427

(2001). Further, in matters involving minors, the circuit court receives broad discretion and great

deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not

disturb a circuit court's unfitness finding unless it is contrary to the manifest weight of the

evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005). A circuit

court's decision is against the manifest weight of the evidence only where the opposite

conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 20          One basis for the circuit court's unfitness finding was section 1(D)(m)(ii) of the

Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)), which provides a parent may be declared

unfit if he or she fails "to make reasonable progress toward the return of the child to the parent

during any 9-month period following the adjudication of neglected or abused minor under

Section 2-3 of the Juvenile Court Act." Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoting *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). Moreover, they have explained reasonable progress as follows:

> " '[T]he benchmark for measuring a parent's "progress toward the return of the child" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent.' " *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (quoting *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050).

Additionally, this court has explained reasonable progress exists when a circuit court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387).

¶ 21          In determining a parent's fitness based on reasonable progress, a court may only

consider evidence from the relevant time period.  *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)).  Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial."  *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844.  In this case, the petition alleged the relevant nine-month period was February 14, 2018, to November 14, 2018.  Additionally, "time spent in prison does not toll the nine-month period."  *In re J.L.*, 236 Ill. 2d 329, 341, 924 N.E.2d 961, 968 (2010).

¶ 22        Here, respondent was incarcerated in the Coles County jail the entire relevant nine-month period, except for the three weeks he was in a substance-abuse treatment facility. Respondent returned to jail from the treatment facility because he had used methamphetamine. Due to his incarceration, respondent declined visitation with V.H.  Respondent blames his lack of progress on his caseworker for not confirming his statement no services were available to him in jail and for not testifying more about the substance-abuse treatment facility.  Regardless, respondent had two things under his control during the nine-month period.  One was visits with V.H., and he declined those.  The second thing was his participation in the substance-abuse program at Our House, and respondent did not complete the program because he used methamphetamine.  Thus, regardless of the caseworkers' actions, respondent's own actions show he did not make reasonable progress toward the return of V.H. during the relevant nine-month period.

¶ 23        Accordingly, we conclude the circuit court's finding respondent was unfit based on section 1(D)(m)(ii) of the Adoption Act was not against the manifest weight of the evidence.

¶ 24        Since we have upheld the circuit court's determination respondent met the

statutory definition of an "unfit person" on the basis of failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)), we do not address the other bases for respondent's unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004). Additionally, respondent does not challenge the court's best-interests finding, and thus, we do not address it.

¶ 25                                III. CONCLUSION

¶ 26          For the reasons stated, we affirm the Champaign County circuit court's judgment.

¶ 27          Affirmed.

¶ 28        JUSTICE DeARMOND, specially concurring:

¶ 29        I agree with both the outcome and the analysis of this case and believe there was more than enough evidence upon which the court could find both parental unfitness and termination to be in the best interests of the minor. My only area of disagreement is with the negative inference drawn by the other members of the panel from respondent declining visits while incarcerated. In fact, I consider it perhaps the one truly thoughtful thing he did on behalf of the minor.

¶ 30        As a trial judge, I opposed visits with incarcerated parents as being more detrimental than beneficial over the long-term. Forcing young children to be exposed to the local jail or penitentiary environment, the processing, the surroundings, and artificial circumstances under which they spent time with their incarcerated parent was never shown to me to be beneficial. Sometimes it necessitated long hours in a car to transport them to the penitentiary and back. If the parent was in the local jail, transportation was not an issue. If, however, he or she was housed out of county, the child still had to be transported to and from. Not infrequently the person doing the transporting was someone other than the caseworker with whom the child had some level of familiarity. Forcing a minor child to see their parent under those circumstances was not, in my opinion, in the child's best interests. After forty-two years, I have yet to have someone tell me it was.