NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221034-U

NOS. 4-22-1034, 4-22-1035 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 26, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* E.H. and Z.S., Minors; | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Winnebago County |
| v. | ) | Nos. 19JA238 |
| Amber H., | ) | 21JA94 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court granted appointed counsel's motion to withdraw as appellate counsel and affirmed the trial court's judgment finding respondent unfit and terminating her parental rights.

¶ 2   Respondent, Amber H., appeals from the trial court's judgment finding her to be an unfit parent and terminating her parental rights as to her minor children, E.H. (born October 22, 2014) and Z.S. (born March 22, 2021). On appeal, appointed counsel now moves to withdraw as appellate counsel on the basis that no colorable argument can be made the court's fitness or best interest findings were erroneous. We grant counsel's motion and affirm.

¶ 3                    I. BACKGROUND

¶ 4          A. The Petitions for Adjudication of Wardship

¶ 5                                    1. *E.H.*

¶ 6          On June 6, 2019, the State filed a petition for adjudication of wardship with respect to E.H., alleging she was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)). Specifically, the State alleged E.H. was in an injurious environment because respondent (1) failed to cure the conditions that led to the removal of E.H.'s sibling (count I), (2) had a substance abuse issue (count II), and (3) had mental health issues (count III). The State subsequently amended the petition to allege E.H. was also neglected because, while in respondent's care, she had been exposed to acts of violence (count IV). In February 2020, following a hearing, the trial court found the State had proven counts I, III, and IV by a preponderance of the evidence and entered an order adjudicating E.H. neglected. In July 2020, following a hearing, the court entered a dispositional order finding respondent unfit to care for E.H. and making her a ward of the court.

¶ 7                                    2. *Z.S.*

¶ 8          On March 25, 2021, the State filed a petition for adjudication of wardship with respect to Z.S., alleging he was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)). Specifically, the State alleged Z.S. was in an injurious environment because respondent (1) failed to cure the conditions that brought Z.S.'s sibling into care (count I) and (2) had mental health issues that prevented her from properly parenting (count II). On July 16, 2021, the court found the State had proven both counts by a preponderance of the evidence and entered an order adjudicating Z.S. neglected. In August 2021, the court entered a dispositional order finding respondent unfit to care for Z.S. and making him a ward of the court.

¶ 9                          B. The Petition for Termination of Parental Rights

¶ 10        On September 22, 2022, the State filed petitions seeking findings of unfitness and termination of respondent's parental rights as to E.H. and Z.S. In E.H.'s case, the State alleged respondent was an unfit parent within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) because she failed to (1) protect E.H. from environmental conditions injurious to her welfare (count I), (2) make reasonable efforts to correct the conditions that led to the minor's removal during any nine-month period from October 14, 2020, to August 11, 2022 (count II), and (3) make reasonable progress toward E.H.'s return during any nine-month period from October 14, 2020, to August 11, 2022 (count III). In Z.S.'s case, the State raised the same allegations but with the time frame in count II and count III being any nine-month period from July 16, 2021, to August 11, 2022.

¶ 11                                1. *The Fitness Hearing*

¶ 12        The trial court conducted a fitness hearing on October 4, 2022, and November 2, 2022.

¶ 13                                a. Samantha Hagerman

¶ 14        The State called as its first witness Samantha Hagerman, the minors' caseworker since October 2020. Hagerman explained that E.H.'s case was opened because "[t]here was a fight between [respondent] and another person *** [and respondent] went to jail and there was nobody there for [E.H.]," while Z.S.'s case was opened at his birth due to E.H.'s pending case. Hagerman testified an integrated assessment was completed to determine which services needed to be included in respondent's service plan. Based on the integrated assessment, the following services were added to the plan: "Mental health, domestic violence, substance abuse, visitation, and cooperation with the agency." Hagerman identified two integrated assessments and six service plans, all of which were admitted into evidence.

¶ 15       Hagerman testified respondent had maintained contact with the agency throughout the case and regularly attended visits with the minors. However, Hagerman further testified respondent had not completed her required mental health, domestic violence, or substance abuse services. With respect to the mental health services, respondent was required to attend individual counseling sessions and complete a psychological evaluation. While respondent regularly attended counseling sessions, Hagerman testified she "has not made progress" and her mental health "has been unstable during the case." Respondent completed a portion of the psychological evaluation in June 2022 but refused to complete the full evaluation. Thus, according to Hagerman, respondent's compliance with the mental health services had never been graded as satisfactory during the case.

¶ 16       Hagerman testified the agency still had concerns about respondent exposing the minors to domestic violence. Respondent had an order of protection against E.H.'s father and had been involved in instances of domestic violence with Z.S.'s father in October or November 2020, while she was pregnant with Z.S., and in April 2021 and January 2022. Hagerman further testified respondent had been referred to a 26-week domestic violence program, but she did not complete the program. According to Hagerman, the agency also had concerns about respondent's substance abuse. Respondent used marijuana throughout the duration of the case and never passed a drug screening. Respondent completed a substance abuse assessment in May 2021, and intensive outpatient treatment was recommended. Respondent never engaged in the recommended treatment.

¶ 17                          b. Amnesty Viveros

¶ 18       Respondent called Amnesty Viveros, a "mental health clinician, post grad intern" with Clarity Counseling, to testify. Viveros began working with respondent as her individual

- 4 -

counselor in December 2021. Viveros met with respondent once per week. Viveros testified respondent's initial treatment plan was focused on processing her past trauma, which involved a three-phase process. Viveros testified that between December 2021 and May 2022, "it was like we were stuck in this loop with her of just replaying trauma that she's been through, things that are going on in her casework, her children. So we weren't really getting anywhere with her." Because no progress was being made, in May 2022, Viveros "decided that instead of focusing on her trauma, we're going to focus on backing up, going back to phase 1 and working on her basic skills, coping skills, emotional regulation, those sorts of things." According to Viveros, respondent exhibited "great improvement" following the change to the treatment plan and had been "able to use some of the skills" discussed in counseling and "show a little bit more control" over her impulses. On cross-examination, Viveros acknowledged that, despite the progress that had been made since May 2022, respondent remained at the first phase of the three-phase process.

¶ 19                                    c. Respondent

¶ 20        Respondent testified on her own behalf. She testified that she communicated with the agency regularly as required by her service plan. Respondent completed a six-week outpatient program called "Managing Your Wellness" in January 2021. She began attending individual domestic violence counseling when E.H.'s case was opened, and she would meet with her counselor one day per week for one hour. Respondent also began attending individual counseling sessions through Clarity Counseling in 2019 or 2020 to process the trauma from her past. Respondent testified that, as a result of the counseling sessions, she had "learned a lot, and as long as I keep having triggers, it will never heal." Respondent further testified she would get triggered by various aspects of the minors being in care and that when she gets triggered, she

- 5 -

gets "angry," "disturbed," and sometimes "can't even function." Respondent took a psychological evaluation in June 2022. The evaluation lasted for several hours, until respondent "was triggered" and unable to complete it. Respondent explained that she became triggered when the evaluator attempted to test her intelligence quotient (IQ). This triggered respondent because her "IQ is not that high" and it made her feel "slow" and "embarrassed." Respondent testified she refused to comply with the drug screenings because she smokes marijuana as "it helps me cope, and it's a mind stimulator from all the stress and anxiety and trauma and depression that this agency has put me through." When asked if she was willing to engage in the services recommended from the psychological evaluation, respondent answered, "[e]verything except medication."

¶ 21                              d. The Trial Court's Finding

¶ 22        The trial court found the State had proven each count alleged in the termination petition pertaining to E.H. and had proven counts II and III as alleged in the termination petition pertaining to Z.S. The court noted that "from the first day of this case it was clear that the primary issue with [respondent] was mental health and domestic violence," but she failed to make any progress in her counseling sessions and had been involved in multiple domestic violence incidents with the minors' respective fathers. The court also highlighted respondent's "insistence on self-medicating with marijuana throughout this case."

¶ 23                              2. *The Best Interest Hearing*

¶ 24        The trial court conducted a best interest hearing on November 30, 2022. Upon the State's request, the court took judicial notice of the record of the fitness proceedings and the best interest report prepared by Hagerman and submitted in anticipation of the hearing. The State did not present any further evidence.

¶ 25        According to the best interest report, E.H. had been placed in the same home since her case was opened. One of her siblings had been adopted by the foster parents, who provided for all of her basic needs and were willing to foster a relationship between E.H. and Z.S. although they were placed in separate homes. E.H. called her foster parents "mom" and "dad" and had told them multiple times that she wished to stay with them. E.H. had been in the same school since being placed with her foster parents and had been able to make friends. The foster parents expressed their desire to adopt E.H. As for Z.S., he had been with his foster parents for approximately 10 months at the time of the best interest hearing. The foster parents took Z.S. to doctor's appointments and provided him with a safe and secure home environment. The foster parents wanted to ensure Z.S. was able to maintain a relationship with E.H. Although Z.S. was too young to express his wishes, he appeared happy with his foster family, constantly playing in the house and hugging his foster parents. Z.S. was also very close with the other children in the home. The foster parents expressed their desire to adopt Z.S.

¶ 26        Respondent testified on her own behalf at the best interest hearing. Respondent reviewed photos of her and the minors taken at their visits, and the photos were admitted into evidence without objection. The minors are smiling in the photos. Respondent testified she had a "bond that can't be broken" with E.H. and Z.S. She stated E.H. referred to her as "Mommy" and, although Z.S. was not yet verbal, he would run to her and give her hugs and kisses at their visits.

¶ 27        Following the presentation of the evidence and the arguments of the parties, the trial court found it was in the minors' best interest to terminate respondent's parental rights as to both E.H. and Z.S. The court noted the minors' need for permanence and that both were "well-taken care of" and "bonded to their placement." On the other hand, respondent was "not close to

reunification" given her inability to appropriately address her mental health and domestic violence issues.

¶ 28 This consolidated appeal followed.

¶ 29 II. ANALYSIS

¶ 30 On appeal, appointed counsel contends no colorable argument can be made that the trial court erred in finding respondent unfit or in terminating her parental rights.

¶ 31 A. The Fitness Determination

¶ 32 Counsel contends, in part, she is unable to raise a potentially meritorious argument on appeal that the trial court erred in finding respondent failed to make reasonable progress toward the minors' return during any nine-month period following their respective adjudications of neglect.

¶ 33 In a proceeding to terminate parental rights, the State must first prove by clear and convincing evidence that the parent is unfit. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re D.D.*, 196 Ill. 2d 405, 417 (2001). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). "A reviewing court will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

¶ 34 Under the Adoption Act, an unfit parent includes any parent who fails to make reasonable progress toward his or her child's return during any nine-month period following the

neglect adjudication. 750 ILCS 50/1(D)(m)(ii) (West 2020). In addressing section 1(D)(m) of the Adoption Act, the supreme court has stated as follows:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

This court has described reasonable progress as "an 'objective standard,' " which exists "when 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)).

¶ 35 Here, Samantha Hagerman, the minors' caseworker, testified respondent's service plan required her to engage in and complete the following services: "Mental health, domestic violence, substance abuse, visitation, and cooperation with the agency." Hagerman testified respondent regularly visited with the minors and kept in contact with the agency. However, respondent failed to satisfactorily engage in the mental health, domestic violence, or substance abuse services. According to Hagerman, respondent had been "unstable during the case for mental health." Respondent attended individual counseling but made no progress and was unable to incorporate any lessons into her daily life. She also failed to fully complete a psychological evaluation as required by the service plan. Respondent testified that she would not comply with

the recommendations from the evaluation if those recommendations required her to take medication. As for domestic violence services, Hagerman testified respondent was referred to "Turning Points at Children's Home & Aid" for a 26-week program. Respondent never completed the program. Hagerman further stated respondent had an order of protection against E.H.'s father and had been involved in numerous domestic violence incidents with Z.S.'s father between October 2020 and January 2022, including at least one instance that occurred during her pregnancy with Z.S. With respect to the substance abuse services, respondent completed an assessment and was recommended for intensive outpatient treatment, but she refused to engage in those services. Respondent also refused to abstain from marijuana use and either failed or did not complete each of her mandated drug screenings.

¶ 36 Based on the evidence above, we agree with counsel that no argument can be made the trial court's unfitness finding was against the manifest weight of the evidence. The evidence presented at the fitness hearing shows respondent made little to no progress toward completing her mental health, domestic violence, or substance abuse services. Hagerman testified respondent had been mentally unstable throughout the duration of the case and was making no progress in her counseling sessions. Moreover, respondent refused to stop using marijuana and had been involved in numerous domestic violence incidents between late 2020 and early 2022. Given her inability to comply with the service plan, the court could not have returned the minors to respondent's care in the near future. *Id.* Therefore, we find no colorable argument can be made that the court's fitness determination was against the manifest weight of the evidence. See *Gwynne P.*, 215 Ill. 2d at 349 ("A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.").

¶ 37 B. The Best Interest Determination

- 10 -

¶ 38    Counsel also contends she can raise no potentially meritorious argument that the trial court erred in finding termination of respondent's parental rights was in the minors' best interest. We will not reverse a best interest determination absent a finding it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 39    At the best interest stage of termination proceedings, the court must determine whether the State has proven that termination of the respondent's parental rights is in the minor's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020). The focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) lists the best interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child.

¶ 40    Here, we agree with counsel that no colorable argument can be made that the trial court's best interest determination was against the manifest weight of the evidence. According to the best interest report, E.H. had been placed in the same home since her case opened, and one of her siblings also lived in the home. Hagerman indicated in the report that the foster parents

provided for all of E.H.'s needs and wanted to foster a relationship between her and Z.S. E.H. had been attending the same school for three years and had friends at the school. E.H. even told the foster parents on multiple occasions that she wished to stay with them, and the foster parents expressed their desire to adopt her. As for Z.S., he had been with his foster parents for approximately 10 months at the time of the best interest hearing. The foster parents took Z.S. to doctor's appointments and provided him with a safe and secure home environment. The foster parents wanted to ensure Z.S. was able to maintain a relationship with E.H. Although Z.S. was too young to express his wishes, he appeared happy with his foster family. Z.S. was also very close with the other children in the home, and the foster parents expressed their desire to adopt him.

¶ 41 Based on the above, no argument can be made that the trial court's best interest determination was against the manifest weight of the evidence. The evidence presented at the hearing demonstrates that both minors were placed in safe and loving environments with foster parents who wished to adopt them, whereas respondent was no nearer to reunification than she was when E.H.'s case opened in 2019. The minors' need for permanence strongly supports the court's best interest determination. Thus, we agree with counsel and grant her motion to withdraw.

¶ 42                                  III. CONCLUSION

¶ 43 For the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 44 Affirmed.