NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260167-U

NO. 4-26-0167

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 23JA219 |
| v. | ) | |
| Taylor G., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court granted appointed appellate counsel's motion to withdraw and
affirmed the trial court's judgment terminating respondent's parental rights to her
minor child.

¶ 2     Respondent, Taylor G., appeals the trial court's judgment terminating her parental

rights to her minor child, R.G. (born in September 2021). On appeal, her appointed appellate

counsel moves to withdraw on the basis he can raise no colorable argument the court erred in

terminating her parental rights. We grant counsel's motion and affirm the trial court's judgment.

¶ 3                              I. BACKGROUND

¶ 4                          A. Neglect Proceedings

¶ 5     In December 2023, the State filed a shelter care petition alleging R.G. was

neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act)

(705 ILCS 405/2-3(1)(b) (West 2022)) because his environment was injurious to his welfare.

Specifically, the State alleged that on October 6, 2023, respondent admitted to police officers that she had "made threats of suicide in that she intended to wreck her vehicle with her child in the car." After disclosing this information, respondent was taken to the hospital for a psychiatric evaluation and subsequently admitted to the hospital's psychiatric unit involuntarily for a period of four days. Following her release from the hospital on October 10, 2023, respondent "refused to take her psychotropic medication" and failed to comply with a "safety plan" implemented by the Illinois Department of Children and Family Services (DCFS) in that she did not "obtain a mental health assessment to assess if she could safely parent the minor." The trial court conducted an adjudicatory hearing and found probable cause to believe R.G. was neglected. The court entered an order granting temporary custody of the minor to DCFS.

¶ 6　　　　　On April 18, 2024, the trial court entered (1) an adjudicatory order adjudicating the minor neglected under section 2-3(1)(b) of the Juvenile Court Act (*id.*) and (2) a dispositional order making him a ward of the court. The court also entered a "SUPPLEMENTAL TASK ORDER" setting forth the tasks respondent had to complete to have the minor returned to her care. Specifically, she was required to complete the following: (1) cooperate with DCFS, (2) communicate with the caseworker and provide all requested information, (3) maintain stable housing, (4) attend visits with the minor, (5) undergo a psychological examination and comply with any recommended treatment, (6) undergo a substance abuse assessment and comply with any recommended treatment, (7) complete a parenting class, (8) complete a domestic violence class, and (9) attend individual counseling sessions.

¶ 7　　　　　　　　　　　B. Termination Proceedings

¶ 8　　　　　On December 2, 2025, the State filed a supplemental petition to terminate respondent's parental rights to R.G., alleging she was an "unfit person" within the meaning of

section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) because she failed to make reasonable progress toward the minor's return during the nine-month period from February 20, 2025, to November 20, 2025.

¶ 9                                   1. *Fitness Hearing*

¶ 10            On February 5, 2026, the trial court conducted a hearing on the fitness portion of the State's termination petition. The State called the caseworker assigned to R.G.'s case, Hannah Simonovic, to testify. Respondent testified on her own behalf.

¶ 11                              a. Hannah Simonovic

¶ 12            Hannah Simonovic testified that she was the caseworker assigned to R.G.'s case during the nine-month period identified in the State's petition. Simonovic testified that in addition to the services listed in the supplemental task order, respondent was also required to complete a drug screening "three times a month." During the relevant time period, respondent failed to appear for 12 screenings and tested positive for marijuana at each screening she completed. In May 2025, Simonovic discussed respondent's marijuana usage with her and directed her to complete another substance abuse assessment. The next month, respondent told Simonovic that she had completed the assessment, but she did not disclose to Simonovic whether treatment had been recommended. In early November 2025, Simonovic obtained a copy of the assessment, and it indicated respondent had been diagnosed with "severe alcohol and severe marijuana usage." The assessment "also stated *** that she refused to complete treatment and left without making a follow-up appointment." Simonovic filed an "Addendum Report" in the trial court discussing the assessment, and she provided respondent with a copy on November 11, 2025. Three days later, Simonovic "received a message from [respondent] stating that she was checking herself into [the psychiatric unit] at Carle Health." Respondent's mother told

Simonovic that respondent had voluntarily admitted herself because she was upset about the addendum report. Respondent was released from the hospital on November 18, 2025.

¶ 13 Simonovic testified that she also continued to have concerns with respondent's anger management throughout the nine-month period. Simonovic described an incident that occurred in June 2025 where respondent "was angry about how court went and was speaking to her mom about [Simonovic] and how she didn't agree and was quite angry and refused *** to speak [to her]." And, after a hearing on November 20, 2025, the final day of the nine-month period, Simonovic "was informed that [respondent] said 'Fuck the judge' and also *** stated to [counsel for the State] *** 'Fuck you, you dumb blonde bitch.' " According to Simonovic, respondent "appeared very enraged" and "was also suicidal, making suicidal threats and ideations."

¶ 14 Simonovic testified that respondent had been attending counseling sessions at the beginning of the nine-month period. However, in June 2025, respondent's therapist informed Simonovic that at some time prior to May 31, 2025, respondent's "insurance had lapsed and she was not attending counseling and [the therapist] tried to reach out multiple times to get her new insurance and [respondent] did not respond." After reviewing her notes, Simonovic clarified that "from March 13th until June 26th," respondent "only had one to two counseling sessions." She reengaged with her counseling services in July 2025 and attended consistently for the remainder of the nine-month period. But, according to Simonovic, "despite her going to counseling, [she] had difficulty maintaining her mental health." Simonovic testified that at the conclusion of the nine-month period, respondent was no closer to having R.G. returned to her care.

¶ 15 b. Respondent

¶ 16 Respondent testified that in June 2024, a doctor had prescribed her a "medical

marijuana card" for "severe back pain from the two failed epidurals when [she] had [her] son." Respondent testified that the prescribing doctor "agreed [with her] that the safe option was marijuana instead of narcotics." She further testified that she had "cut back tremendously" on her marijuana usage "and now it's only right before [she goes] to bed." With respect to her alcohol consumption, she indicated that she only had "the occasional one or two drinks every once in a while if we go out but not every day."

¶ 17                              c. The Trial Court's Unfitness Finding

¶ 18         After hearing the arguments of the parties, the trial court found the State had proven respondent unfit by clear and convincing evidence. In articulating its reasoning, the court began by noting, "[T]his case came into care [because of respondent's] mental health that was a significant concern for the child's well-being," "but the issues that were pervasive throughout this period were [respondent's] mental health and *** substance abuse." The court then highlighted that even though respondent had been diagnosed with "a severe cannabis use disorder," she tested positive for marijuana at each completed drug screening. The court further found that respondent's testimony was not credible and her engagement in mental health and substance abuse services was not in earnest, stating:

> "In looking at all of [respondent's] statements *** throughout the interviews and assessments that she had with the clinicians, both substance abuse and mental health, *** there's varying stories and some of which she said today on the stand never reported to another clinician throughout *** and so I think that there is a level of dishonesty or picking and choosing rather than just being completely forthright with the clinicians in order to engage earnestly in these services."

Lastly, the court found respondent's psychiatric records and November 2025 admission to the

hospital "show[ed] an escalation in her mental health instability" and that "her mental health continue[d] to remain unstable."

¶ 19                                        2. *Best Interest Hearing*

¶ 20          Immediately after announcing its unfitness finding, the trial court proceeded to the best interest portion of the State's termination petition. The State called Simonovic and R.G.'s foster father, Steve T., to testify. Respondent did not present any evidence.

¶ 21                                        a. Simonovic

¶ 22          Simonovic testified that R.G. had been living with his maternal grandparents since he came into care in December 2023. Simonovic went to the foster home two times per month to inspect the home and observe the interactions between R.G. and his foster parents. She described them as having "a very loving, close relationship." She explained, "He will hug them in my presence. He will speak to them, he said I love you to them once before in my presence. He's very close with them." According to Simonovic, the foster parents showed R.G. love and affection, and they were meeting all of his needs—such as providing him with adequate food, shelter, and clothing and taking him to all of his medical appointments. Simonovic testified that the foster home was "clean and appropriate" and R.G. had his own bedroom. She further testified that she had no concerns about the foster parents, who had expressed their willingness to adopt the minor if necessary.

¶ 23          On cross-examination by counsel for respondent, Simonovic testified that respondent demonstrated appropriate parenting skills during her visits with R.G. Respondent showed interest in engaging with his interests, and she would bring him lunch when the visits occurred during his lunchtime. Simonovic also testified that R.G. loved respondent. He called her "mommy" and would get excited when he saw her.

¶ 24       On cross-examination by the guardian *ad litem*, Simonovic testified that at the time of the hearing, respondent was no closer to having the minor returned to her care than she was at the end of the nine-month period in November 2025. She explained that respondent had yet to complete the treatment recommended in the substance abuse assessment, continued to test positive for marijuana, and tested positive for alcohol the month prior.

¶ 25                                        b. Steve T.

¶ 26       Steve T.  testified that he and his wife were R.G.'s maternal grandparents and foster parents. No other people lived in the foster home. Steve described R.G. as a happy and social child. At the time of the hearing, R.G. was four years old and attending preschool, where he had made several friends. Steve testified that R.G. did "have some [attitude] problems at school." However, he and his wife "just had a meeting with occupational therapy, speech therapy, the teachers, *** and they said overall [R.G.'s] progress has been good." Steve testified, "I was worried that some of the outbursts were because of this, but a lot of it is just being four and a half, a boy." Steve further testified that R.G. had plenty of toys at the house and enjoyed running through sprinklers in the summer. R.G. had his own bedroom, but he preferred to sleep with the foster parents. Steve testified that he "[a]bsolutely" loved R.G. and he and his wife had already agreed that they would adopt him if necessary.

¶ 27                             c. The Trial Court's Best Interest Determination

¶ 28       After hearing the arguments of the parties, the trial court announced its ruling that the State had proven termination of respondent's parental rights was in the minor's best interest. The court identified the best interest factors it found favored termination, stating: "[I]n reviewing the best interest factors, as it relates to the child's physical safety and welfare and development of the child's identity, his sense of attachment, continuity of affection, least disruptive placement

option, the community ties, and most significantly the child's need for permanence all those factors favor termination." The court acknowledged that there was a bond between R.G. and respondent, her visits with him went well, and she "loves him very much." Nonetheless, the court stated, "[T]hat love in and of itself is not sufficient to provide a stable, suitable future for the child. The child's needs prevail when I have to consider each of these permanency *** decisions in looking at his future."

¶ 29    This appeal followed.

¶ 30                                   II. ANALYSIS

¶ 31    On appeal, appointed counsel asserts he can raise no colorable argument the trial court erred in (1) finding respondent unfit or (2) determining it was in the minor's best interest to terminate her parental rights.

¶ 32                              A. Unfitness Finding

¶ 33    First, counsel asserts he can raise no colorable argument the trial court erred in finding respondent unfit for failing to make reasonable progress toward the minor's return to her care where the evidence showed that during the nine-month period from February 20, 2025, to November 20, 2025, respondent "refused to participate in drug treatment, tested positive for cannabis in all her drug drops, missed numerous other drug drops, failed to adequately address and overcome her mental health issues, and did not make progress toward a return to home of the minor."

¶ 34    Section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)) "delineates a two-step process in seeking termination of parental rights involuntarily." *In re J.L.*, 236 Ill. 2d 329, 337 (2010). First, the State must prove by clear and convincing evidence that the parent is unfit. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). In making such a determination,

the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re D.D.*, 196 Ill. 2d 405, 417 (2001). Under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)), an unfit parent includes any parent who fails to make reasonable progress toward his or her child's return during any nine-month period following the neglect adjudication.

¶ 35 Our supreme court has provided the following guidance for measuring a parent's progress toward the return of her child pursuant section 1(D)(m)(ii) of the Adoption Act:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

We have described " 'reasonable progress' " as "an 'objective standard,' " which exists "when 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)). "A reviewing court will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

¶ 36    Here, we agree with counsel that it would be frivolous to argue the State failed to prove respondent unfit for failing to make reasonable progress toward R.G.'s return during the nine-month period from February 20, 2025, to November 20, 2025. The minor initially came into care due to concerns about respondent's mental health, stemming from her suicidal ideations that led to her being involuntarily admitted to the hospital's psychiatric unit in December 2023. In relevant part, to have R.G. returned to her care, respondent was required to cooperate with the caseworker and provide her with all requested information, complete three drug screenings per month, comply with the treatment recommendations of her substance abuse assessment, and consistently attend counseling sessions.

¶ 37    The evidence presented at the fitness hearing showed that during the relevant nine-month period, respondent failed to complete 12 drug screenings and tested positive for marijuana at each screening she completed. In May 2025, Simonovic directed respondent to complete another substance abuse assessment due to her positive drug tests. The next month, respondent told Simonovic she had completed the assessment. However, she did not provide Simonovic with any treatment recommendations. In November 2025, Simonovic obtained a copy of the assessment, and it showed respondent had been diagnosed with "severe alcohol and severe marijuana usage" but "refused to complete treatment and left without making a follow-up appointment." When respondent learned Simonovic had filed an addendum report with the trial court about the assessment, she was very upset and voluntarily admitted herself to the hospital in November 2025. After a hearing on the final day of the nine-month period and two days after she had been released from the hospital, respondent "appeared very enraged" and "was also suicidal, making suicidal threats and ideations." With respect to counseling, respondent failed to inform Simonovic that her "insurance had lapsed," and she had only attended "one to two counseling

sessions" between March 2025 and June 2025. Although respondent did reengage with counseling in July 2025, Simonovic testified that she continued to have "difficulty maintaining her mental health." Simonovic further testified that respondent was no closer to R.G.'s return at the end of the nine-month period than she was at the beginning.

¶ 38    Accordingly, based on respondent's failure to comply with the required services discussed above, we agree with appointed appellate counsel that no colorable argument can be made the trial court's unfitness finding was against the manifest weight of the evidence.

¶ 39                    B. Best Interest Determination

¶ 40    Next, counsel asserts he can raise no colorable argument the trial court erred in finding termination of respondent's parental rights was in R.G.'s best interest.

¶ 41    If the State satisfies its burden of proving the respondent unfit, the termination proceedings advance to the second stage, where the State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. 705 ILCS 405/2-29(2) (West 2024). At the best interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)) lists the best interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks

associated with substitute care; and (10) the preferences of the persons available to care for the child. We will not reverse a best interest determination absent a finding it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 42    Here, we agree with counsel that it would be frivolous to argue the State failed to prove termination of respondent's parental rights was in R.G.'s best interest. The evidence presented at the best interest hearing showed the minor had been living with his maternal grandparents on an uninterrupted basis since being removed from respondent's care. Simonovic testified that the foster home was "clean and appropriate" and R.G. had his own bedroom. Simonovic described the relationship between R.G. and his foster parents as "very loving" and "close." The foster parents were meeting all of R.G.'s needs—such as providing him with adequate food, shelter, and clothing and taking him to all of his medical appointments. Simonovic stated she had no concerns with the foster parents caring for R.G. Moreover, Steve testified that R.G. was in preschool and had made several friends. Steve described R.G. as a happy and social child and noted he had plenty of toys to play with at the foster home. Steve further testified that he and his wife "[a]bsolutely" loved R.G. and they had already agreed that they would adopt him if necessary. On the other hand, Simonovic testified that respondent demonstrated appropriate parenting skills during her visits with R.G. and it was apparent that he loved her and knew that she was his mother. However, Simonovic also testified that since being found unfit, respondent was no closer to having R.G. returned to her care because she had yet to engage in the treatment recommended following the substance abuse assessment and she continued to fail her drug screenings. Accordingly, we agree with appointed appellate counsel that no colorable argument can be made the trial court's best interest determination was against

the manifest weight of the evidence.

¶ 43                                          III. CONCLUSION

¶ 44            For the reasons stated, we grant appointed appellate counsel's motion to withdraw

and affirm the trial court's judgment.

¶ 45            Affirmed.